# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 13, 2017      Decided December 15, 2017

No. 17-5042

REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND
ASSOCIATED PRESS,
APPELLANTS

v.

FEDERAL BUREAU OF INVESTIGATION AND UNITED STATES
DEPARTMENT OF JUSTICE,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01392)

———

*Katie Townsend* argued the cause for appellants. With her
on the briefs was *Bruce D. Brown*.

*Joseph F. Busa*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief was
*Matthew M. Collette*, Attorney.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and
SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this Freedom of Information Act case, the Reporters Committee for Freedom of the Press and the Associated Press seek information from the Federal Bureau of Investigation regarding its use of undercover tactics involving impersonation of the media and creation of fake news. After the Bureau turned over several pertinent records, the district court granted summary judgment in its favor. We reverse. As explained below, the Bureau has failed to demonstrate that it "conduct[ed] a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Department of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

## I.

In 2007, Seattle-area Timberline High School began receiving anonymous bomb threats, which prompted daily evacuations. *See* U.S. Department of Justice, Office of the Inspector General, *A Review of the FBI's Impersonation of a Journalist in a Criminal Investigation* 1 (2016) ("OIG Report"), Joint Appendix (J.A.) 538. Unable to trace the emailed threats to their sender, local authorities called in cybercrime experts from the FBI's Seattle Division. *Id.* Sensing the handiwork of a narcissist, the FBI agents devised a plan: if they could flatter the culprit into clicking a link to what appeared to be press coverage suggesting that he had outsmarted the authorities, they could, in turn, outsmart him by secretly delivering specialized malware that would reveal his computer's location. *Id.* at 11–12, J.A. 548–49. Warrant in hand, an FBI Special Agent contacted an anonymous social-media account associated with the threats, identified himself as an Associated Press "Staff Publisher," and requested input on a draft article accessible through an emailed link. *Id.* at 14–15, J.A. 551–52. The suspect took the bait, clicking the link and unwittingly downloading the malware. *Id.* at 16, J.A. 553. Within hours, the FBI had its man. *Id.*

Flash forward seven years to October 2014, when an American Civil Liberties Union technologist spotted a reference to the FBI's ruse—which had previously drawn little public attention—in a set of FBI documents released years earlier to an electronic privacy organization. Troubled, the technologist took to Twitter, and within days, news of the media impersonation tactics employed at Timberline prompted headlines nationwide. Facing outcry from news outlets, interest groups, and members of Congress, then–FBI Director James Comey, Jr., penned a letter to the *New York Times* justifying the tactics. But the public's interest had already been roused.

Among those wanting to learn more were the Reporters Committee for Freedom of the Press and the Associated Press, appellants here, which were concerned that "[t]he utilization of news media as a cover for delivery of electronic surveillance software" both "endangers the media's credibility and creates the appearance that it is not independent of the government" and "undermines media organizations' ability to independently report on law enforcement." Letter from Reporters Committee for Freedom of the Press *et al.* to Eric H. Holder, Jr., Attorney General, U.S. Department of Justice, and James B. Comey, Jr., Director, FBI, at 3 (Nov. 6, 2014), J.A. 384. Between them, the two organizations (hereinafter "the Reporters Committee") submitted three requests under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, seeking FBI records on the Bureau's policies governing media impersonation, the use of such tactics during the Timberline investigation, and any other occasions on which the FBI had used fake news links to deliver malware. After the FBI responded to one request by declaring it had found no responsive records, and failed to respond at all to the other two, the Reporters Committee filed suit against the Bureau and its parent agency, the Department of Justice, claiming among other things that the FBI had conducted an inadequate records search. During the course of litigation, the

FBI eventually located and released some responsive records, most pertaining to Timberline and none identifying any other instances of media impersonation. The Reporters Committee insisted that the FBI's search efforts were insufficient, but the district court disagreed and granted summary judgment to the agencies.

## II.

"Designed 'to facilitate public access to Government documents,' [FOIA] requires federal agencies to disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 365–66 (D.C. Cir. 2008) (quoting *Department of State v. Ray*, 502 U.S. 164, 173 (1991)). No exemption is at issue in this appeal; rather, the lone issue before us is whether the FBI responded to the Reporters Committee's FOIA requests by conducting a search adequate to support summary judgment in the government's favor. To prevail on summary judgment, an "agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," which it can do by submitting "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68. "[S]ummary judgment is inappropriate" if "a review of the record raises substantial doubt" as to the search's adequacy, "particularly in view of 'well defined requests and positive indications of overlooked materials.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (quoting *Founding Church of Scientology v. NSA*, 610 F.2d 824, 837 (D.C. Cir. 1979)). "We review *de novo* the adequacy of the [agency's] search." *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015).

Here, the government submitted two declarations from David M. Hardy, Section Chief of the FBI's Record/Information Dissemination Section ("Records Section"), which describe a two-phase search. In the first phase, made up of so-called "targeted searches," the Records Section identified the Bureau divisions it considered reasonably likely to hold responsive records, and transmitted to each such division the verbatim text of the relevant FOIA request along with instructions to "send an e-mail to each of its employees asking them to search for all relevant records pertaining to th[e] request" and "help identify all potentially responsive documents, regardless of whether they may be located in their office or elsewhere in the Bureau." Declaration of David M. Hardy ¶¶ 38–40, 43–45 (Mar. 28, 2016) ("First Hardy Decl."), J.A. 112–16; *see also* Declaration of David M. Hardy ¶¶ 4, 6 (May 20, 2016) ("Second Hardy Decl."), J.A. 492–93.

To facilitate the targeted searches, the FBI divided the records sought into two groups. For Group One records—those "concerning the FBI's utilization of links to what are, or appear to be, news media articles or news media websites to install" certain malware—the Records Section ordered a targeted search of only the Bureau's Operational Technology Division ("Tech Division"). First Hardy Decl. ¶¶ 34, 38–40, J.A. 110, 112–13. The Records Section reasoned that the Tech Division, as the "Division responsible for the deployment and implementation of" the malware used at Timberline, would be "reasonably likely" to hold Group One records and that "no other FBI Divisions or personnel would reasonably likely possess" them. *Id.* ¶ 40, J.A. 113. For Group Two records— including Timberline-specific documents and media-related policy and training materials, as well as "[a]n accounting of the number of times . . . the [FBI] has impersonated media organizations or generated media-style material" to deliver

malware—the Records Section ordered targeted searches of several internal divisions, including the FBI's Seattle Division, the Office of General Counsel, the Tech Division, the Behavioral Analysis Unit, the National Covert Operations Section, and the Training Division. *Id.* ¶¶ 34, 43, J.A. 110–11, 114–15.

According to the Hardy declarations, these internal divisions "completed" the searches they were directed to carry out. *Id.* ¶¶ 39, 44, J.A. 113, 115. In the case of the Group One search, the Tech Division "advised [the Records Section] that no records responsive to th[e] request were located within its Division." *Id.* ¶ 39, J.A. 113. In the case of the Group Two searches, "the FBI was able to locate records responsive to [the Reporters Committee's] requests." *Id.* ¶ 45, J.A. 116.

In the search's second phase, the Records Section conducted a limited index search of the FBI's agency-wide Central Records System ("the Index"), which "index[es] terms in files that are useful to a particular investigation or that are deemed potentially useful for future investigative/intelligence retrieval purposes, such as names of individuals, organizations, companies, publications, activities, or foreign intelligence matters (or programs)." *Id.* ¶ 36, J.A. 112. Initially, the Records Section searched the Index for Timberline records only, using the search terms "Timberline," "Timberline High School," and "Timberline Highschool." *Id.* ¶ 57, J.A. 121. This search yielded "the FBI's main investigative file concerning" the Timberline investigation. *Id.* After "[a] page by page review," however, the Records Section determined that the file contained only records that the Seattle Field Office had already unearthed through its targeted search. *Id.* Although the Records Section at first declined to search the Index for Group One records—*i.e.*, records about other instances in which the FBI used media links to install malware—because the Index would

not "programmatically or logically contain terms that would lead to records responsive" to a request for information about general investigatory tactics, *id.* ¶ 36, J.A. 112, the FBI did later conduct an Index search for Group One records, using the search terms "media impersonation" and "CIPAV," the name of the malware used in the Timberline investigation, Second Hardy Decl. ¶ 5, J.A. 492–93. This search yielded no results. *Id.*

The Reporters Committee argues that the Hardy declarations fail to carry the government's burden of showing that it conducted an adequate search under this circuit's standards. We agree.

The declarations' principal flaw lies in their failure to "set[] forth the search terms and the type of search performed" with the specificity our precedent requires. *Oglesby*, 920 F.2d at 68. The declarations explain that the Records Section "request[ed]" that each targeted office "conduct a search of database systems, as well as paper and manual files, for records responsive to" the Reporters Committee's requests, and "recommended" that each office email its employees, "asking them to search for all relevant records." First Hardy Decl. ¶¶ 38, 43, J.A. 112–15. The declarations go on to say that the targeted divisions "completed" the requested searches, *id.* ¶¶ 39, 44, J.A. 113, 115, without ever describing how those divisions in fact did so.

This circuit's precedent has long made clear that an affidavit containing "no information about the search strategies of the [agency] components charged with responding to [a] FOIA request" and providing no "indication of what each [component's] search specifically yielded" is inadequate to carry the government's summary-judgment burden. *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007); *see also, e.g.*,

*Aguiar v. Drug Enforcement Administration*, 865 F.3d 730, 738–39 (D.C. Cir. 2017) (affidavit identifying agency offices "tasked with conducting a search" of specific files but not explaining "how [the offices] searched within those files" insufficient to support summary judgment); *DeBrew v. Atwood*, 792 F.3d 118, 121–22 (D.C. Cir. 2015) (affidavit identifying agency employees tasked with conducting search, explaining why those employees were chosen, and detailing search's results insufficient "because it [did] not disclose the search terms used by the [agency] and the type of search performed"); *Weisberg v. DOJ*, 627 F.2d 365, 371 (D.C. Cir. 1980) (affidavit that fails to "denote which files were searched or by whom, . . . reflect any systematic approach to document location, . . . [or] provide information specific enough to enable [a plaintiff] to challenge the procedures utilized" is insufficient). This is so, we have explained, because "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, . . . is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." *Oglesby*, 920 F.2d at 68.

Here, the Hardy declarations are utterly silent as to which files or record systems were examined in connection with the targeted searches and how any such searches were conducted, including, where relevant, which search terms were used to hunt within electronically stored materials. This defect is particularly conspicuous when viewed alongside the declarations' far more specific description of the Index search the Records Section conducted for Timberline records. This latter discussion explains the Index's nature and functionality, identifies the search terms used to look within the Index, describes the search results, and attests that FBI personnel

undertook "[a] page by page review" of those results. First Hardy Decl. ¶ 57, J.A. 121.

Even though the Reporters Committee's brief cites our consistent line of cases requiring that government affidavits describe precisely how agency components searched for responsive documents, the government's brief is virtually silent on this precedent, stating only in conclusory fashion that "[a]n agency affidavit, describing a targeted search of a specific office as part of a broader search, does not need to elaborate further" to achieve the level of detail FOIA requires. Appellees' Br. 22. This question-begging assertion fails entirely to engage with the standards our court has developed for determining when an affidavit has adequately "describ[ed] a targeted search of a specific office." *Id.* The government seeks support from our 35-year-old decision in *Perry v. Block*, 684 F.2d 121 (D.C. Cir. 1982) (per curiam), which, as the government points out, stated that an affidavit need not "set forth with meticulous documentation the details of an epic search for the requested records," *id.* at 127. In *Perry*, however, we also made clear—in a passage not quoted by the government—that an affidavit must "explain in reasonable detail the scope and method of the search conducted," and "urge[d] agency affiants and counsel to provide as much specificity as possible to facilitate intelligent assessment of the submitted information." *Id.* Although the *Perry* court ultimately determined that summary judgment for the government was appropriate on the specific facts of that case, the affiants there attested that they had personally participated in searches of specifically identified records systems—and, even so, the court found the affidavits "arguabl[y] inadequa[te]" and remarked that they "could have been more detailed." *Id.* at 127 & nn.20–21.

Pressed at oral argument to reconcile the government's position here with circuit precedent, government counsel offered a new explanation for the Hardy declarations' failure to describe the targeted searches with anything resembling precision. According to counsel, in "all of [our] prior cases talking about search terms," plaintiffs sought "specific information about an identifiable individual or code word . . . or administrative warrants known to exist within a single investigative file," Oral Arg. at 18:12–29, whereas the FOIA requests here sought "something nebulous and vague, not known to exist," *id.* at 21:30–33. This proposed distinction is both wrong and irrelevant. It is wrong because our cases have demanded greater specificity from the affidavit in connection with equally generic FOIA requests. *See, e.g.*, *DeBrew*, 792 F.3d at 121–22 (affidavit insufficient to determine adequacy of search for "[a]ll documentation for making Conducting a Business . . . a prohibited act" under Bureau of Prisons guidelines). And it is irrelevant because the specifics of a particular FOIA request have no logical bearing on an agency's ability to make a factual representation of what steps it has taken to honor the request. Here, for example, the FBI could have explained that it was difficult to come up with search terms reasonably calculated to turn up the records the Reporters Committee sought and then gone on to describe how it attempted to work around that difficulty. Because the FBI failed to offer any such explanation, the Reporters Committee was left without "information specific enough . . . to challenge the procedures utilized," *Weisberg*, 627 F.2d at 371, and this court lacks any basis for "determin[ing] if the search was [sufficiently] adequate in order to grant summary judgment" to the government, *Oglesby*, 920 F.2d at 68.

## III.

Although the Hardy declarations' inadequate detail is alone sufficient to require reversal, the Reporters Committee

has identified two additional aspects of the FBI's search that concern us.

**A.**

The Reporters Committee argues that the FBI failed to justify its decision to limit its search for Group One records, *i.e.*, "records concerning the FBI's utilization of links to what are, or appear to be, news media articles or news media websites to install" malware, to the Tech Division, while searching more broadly for "documents referring to the decision to create the fake [Associated Press] news article in the Timberline High School case." First Hardy Decl. ¶ 34, J.A. 110–11. Because the former set of requested records encompasses the latter, the Reporters Committee insists, the FBI acted illogically in declining to consider that locations reasonably likely to hold Timberline-specific records would be similarly likely to hold records pertaining more generally to other instances of media impersonation.

We agree that the FBI could have better justified its search methods. For Timberline documents, the Records Section ordered targeted searches of a number of Bureau divisions, including the Office of General Counsel, the Tech Division, the Behavioral Analysis Unit, the National Covert Operations Section, and the Training Division, *id.* ¶ 43, J.A. 114–15; by contrast, for the broader set of Group One documents, Records ordered a targeted search of the Tech Division alone, *id.* ¶ 38, J.A. 112–13. Attempting to justify this distinction, the FBI points out that the Group One request sought records linking media impersonation to the installation of malware, whereas the Timberline request sought records relating only to the decision to impersonate the press in the first place. Because "the FBI's policy specifically states that [the Tech Division] is solely responsible for the deployment and collection of all lawfully conducted electronic surveillance [B]ureau wide,"

Second Hardy Decl. ¶ 4, J.A. 491, the FBI reasoned, nowhere else was likely to hold records regarding the use of malware.

This does not follow. Certainly, the Tech Division's role in approving malware use makes it likely to hold relevant records. But that hardly means that "no other FBI Divisions or personnel would reasonably likely possess records" regarding the tactics used to deploy such malware. First Hardy Decl. ¶ 40, J.A. 113. Indeed, the Timberline incident provides a ready illustration of just what those other divisions might be. For example, record evidence demonstrates that the agents involved in the Timberline investigation conferred with the Behavioral Analysis Unit regarding how best to deliver malware. *See* OIG Report at 12, J.A. 549. Further undermining its claim that malware-related records were likely to appear nowhere but the Tech Division, the Bureau on its own accord elected to group the request for "an accounting of the number of times . . . that the [FBI] has impersonated media organizations or generated media-style material . . . *to deliver malicious software*," First Hardy Decl. ¶ 34, J.A. 111 (emphasis added), with the Group Two requests for which it ordered multiple targeted searches and not with the Group One request for which it searched only the Tech Division.

Put simply, given the FBI's determination that certain divisions were "reasonably likely" to hold records relating to a specific instance where media impersonation was used to deliver malware, its failure to search these very same divisions for records relating to other such instances leaves us unable to conclude, barring some explanation, that the FBI searched for the latter records in a manner "reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68.

In making this observation, we take no position on the adequacy of the FBI's explanation for performing an Index

search for Timberline records but, at least initially, not for the broader set of Group One records. The Hardy declarations justified this distinction by remarking that the Timberline request referenced a particular, named event likely to be indexed (and thus searchable) in the Index, First Hardy Decl. ¶ 41, J.A. 114, whereas an Index search for Group One records would likely have garnered little because "it would be highly unlikely for FBI personnel to index files . . . under the name of a specific technique generally or specifically in reference to impersonating a member of the media," Second Hardy Decl. ¶ 2, J.A. 490. Suffice it to say that the FBI did eventually conduct an Index search for Group One records, and save a passing mention in a footnote in its opening brief, the Reporters Committee does not challenge the adequacy of this search.

**B.**

The Reporters Committee also argues that the search was inadequate because the record contains "lead[s] that [are] both clear and certain," *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996), that should have prompted the FBI to search additional offices—*i.e.*, the FBI Director's Office, field offices other than the Seattle office, and the offices responsible for assisting with a 2016 Office of the Inspector General (OIG) report concerning Timberline and the FBI's media impersonation policies. Beginning with the Director's Office, we consider each of these offices in turn.

Recall that the Reporters Committee and the Associated Press submitted their FOIA requests amidst a national controversy over revelations regarding the FBI's media impersonation tactics. The Attorney General and FBI Director were receiving letters from concerned interest groups and even members of Congress. At the same time, the FBI was responding to articles covering the matter in the popular press, and the FOIA requests specifically referenced these responses.

*See* Letter from Raphael Satter, Associated Press, to FBI, at 2 (Nov. 6, 2014), J.A. 27 (citing an FBI special agent's comment to the *Seattle Times*); Letter from Adam Marshall & Hannah Bloch-Wehba, Reporters Committee for Freedom of the Press, to FBI, at 2 n.1 (Oct. 31, 2014), J.A. 31 (citing *Washington Post* article that contains remarks from FBI officials).

The record unmistakably establishes that the FBI Director's Office was intimately involved in coordinating the Bureau's response. Indeed, in his letter to the editor in the *New York Times*, then-Director Comey called the Timberline tactics "proper and appropriate under Justice Department and [FBI] guidelines at the time," while reassuring the public that by the time of the letter's November 2014 publication, "the use of such an unusual technique would probably require higher level approvals than in 2007." James B. Comey, Director, FBI, Letter to the Editor, "To Catch a Crook: The F.B.I.'s Use of Deception," *New York Times*, Nov. 6, 2014. Although the Director's letter reveals that he was privy to information covered by the FOIA request for "records concerning the FBI's guidelines and policies concerning undercover operations or activities in which a person may act as a member of the news media," First Hardy Decl. ¶ 34, J.A. 111, the Bureau never searched his office.

We acknowledge that "it will be the rare case indeed in which an agency record contains a lead so apparent that the [agency] cannot in good faith fail to pursue it." *Kowalczyk*, 73 F.3d at 389. Nevertheless, we find this exacting standard satisfied here, where the record reveals an agency office directly and conspicuously weighing in on a pointedly relevant, highly public controversy to which a FOIA request expressly refers. *See Valencia-Lucena*, 180 F.3d at 327 ("[I]f an agency has reason to know that certain places may contain responsive

documents, it is obligated under FOIA to search barring an undue burden.").

By contrast, we disagree with the Reporters Committee that references in the record to regional offices other than Seattle's and the September 2016 release of an OIG report concerning Timberline and the FBI's media impersonation policies constitute "clear and certain" indications that additional, unsearched offices held responsive records. *Kowalczyk*, 73 F.3d at 389.

On the first point, the Reporters Committee identifies fleeting references in the record to other FBI field offices that have utilized malware in conducting investigations. None of these references, however, offers any hint—let alone a clear indication—that the FBI used media impersonation as the particular means of deploying the malware.

On the second point, while the OIG report certainly indicates that the offices assisting with its preparation held records at some point prior to September 2016, the FBI utilized cutoff dates of January 6, 2015, and earlier, directing its divisions to search only for records held prior to those dates. Second Hardy Decl. ¶¶ 4, 6, J.A. 492–93. But despite contesting these cutoff dates in the district court, the Reporters Committee failed in its opening brief here to challenge that court's rejection of its argument and so has forfeited the opportunity to do so. *See Russell v. Harman International Industries, Inc.*, 773 F.3d 253, 255 n.1 (D.C. Cir. 2014) (argument not raised in opening brief on appeal is forfeited). And the OIG report contains no clear indication that participating offices held responsive records prior to the cutoff dates, more than a year and a half before the report was issued.

Finally, to the extent the Reporters Committee argues that the OIG report calls the adequacy of the search into question

because it refers to a handful of Timberline-related documents that the search apparently failed to turn up, "the adequacy of a search is 'determined not by the fruits of the search, but by the appropriateness of [its] methods.'" *Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) (alteration in original) (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). That a few responsive documents may have slipped through the cracks does not, without more, call into question the search's overall adequacy. *See Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) ("[A] search, under FOIA, 'is not unreasonable simply because it fails to produce all relevant material.'" (quoting *Meeropol v. Meese*, 790 F.2d 942, 952–53 (D.C. Cir. 1986))).

## IV.

Finding that material factual questions remain as to the adequacy of the FBI's search, we reverse and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*