Opinion for the Court filed by Circuit Judge KAVANAUGH, with whom Senior Circuit Judge WILLIAMS joins.
Dissenting opinion filed by Circuit Judge ROGERS.
KAVANAUGH, Circuit Judge:
In the spring of 1961, some 1,400 Cuban exiles landed on the banks of the Bahía de Cochinos, the Bay of Pigs. They were supported by the Central Intelligence Agency and U.S. military. Their objective was to conquer the beach, nullify Fidel Castro’s air superiority with B-26 bombers and U.S. air support, and hunker down until the inevitable democratic revolution. But the revolution never came. Nor did sufficient supplies or air support. Instead, American pilots were shot down, and most *462 of the exiles were captured and imprisoned.
The now-infamous operation has been the subject of much debate and analysis. Within that genre, one account of the Bay of Pigs invasion is unique because it was written in the Central Intelligence Agency. Beginning in 1973, CIA staff historian Dr. Jack B. Pfeiffer drafted what became a five-volume opus, starting with the CIA’s plans for the air operation and concluding with Dr. Pfeiffer’s assessment of the operation.
Dr. Pfeiffer’s drafts of Volumes I through III ultimately were revised and released to the public by the CIA. The CIA also publicly released Dr. Pfeiffer’s draft of Volume IV. But the CIA has not released the draft of Volume V.
In 2005, a non-profit research institute known as the National Security Archive submitted a request to the CIA under the Freedom of Information Act seeking, as relevant here, Dr. Pfeiffer’s draft of Volume V. (To avoid confusion, we will refer to the non-profit National Security Archive as the “FOIA requester.”) The CIA claims that the draft of Volume V is exempt from disclosure under Exemption 5 of FOIA. The District Court agreed and granted summary judgment to the CIA. Our review of the District Court’s decision is de novo, and we affirm.
=!= * *
Exemption 5 of the Freedom of Information Act protects “inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.” 5 U.S.C. § 552(b)(5). Exemption 5 encompasses the privileges that the Government could assert in civil litigation against a private litigant, such as the attorney-client privilege, the attorney work product privilege, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege. See Baker & Hostetler LLP v. Department of Commerce, 473 F.3d 312, 321 (D.C.Cir.2006).
The CIA here invokes the deliberative process privilege. A form of executive privilege, the deliberative process privilege covers deliberative, pre-decisional communications within the Executive Branch. One of the rationales for the privilege is to encourage the candid and frank exchange of ideas in the agency’s decisionmaking process. “Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process.” United States v. Nixon, 418 U.S. 683, 705, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). This is a concern as old as the Republic. Indeed, at the Constitutional Convention itself, the delegates agreed at the outset that none of the deliberations would be shared with outsiders, and the records were kept secret for more than 30 years. See Nixon v. Administrator of General Services, 433 U.S. 425, 447 n. 11, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977).
The modern application of the deliberative process privilege rests on the same understanding that motivated the Framers in Philadelphia: If agencies were “to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.” Dudman Communications Corp. v. Department of the Air Force, 815 F.2d 1565, 1567 (D.C.Cir.1987) (internal quotation marks and citation omitted). In other words, agency officials “should be judged by what they decided, not for matters they considered before making up their minds.” Russell v. Department of the Air Force, 682 *463 F.2d 1045, 1048 (D.C.Cir.1982) (quotation omitted).
The deliberative process privilege covers communications that are pre-deci-sional and deliberative. See Judicial Watch, Inc. v. FDA 449 F.3d 141, 151 (D.C.Cir.2006). To be pre-decisional, the communication (not surprisingly) must have occurred before any final agency decision on the relevant matter. See id. As this Court has previously noted, the term “deliberative” does not add a great deal of substance to the term “pre-decisional.” See Access Reports v. Department of Justice, 926 F.2d 1192, 1195 (D.C.Cir.1991). The term “deliberative” in this context means, in essence, that the communication is intended to facilitate or assist development of the agency’s final position on the relevant issue. See Russell, 682 F.2d at 1048.
In delineating the scope of the deliberative process privilege, we have held that an agency’s official history is a final agency decision. An agency history constitutes the agency’s “official statement” concerning the agency’s prior actions, and it helps educate future agency decision-makers. Id. (Air Force history of the use of herbicide in Vietnam); see Dudman Communications, 815 F.2d at 1566 (Air Force history of involvement in South Vietnam).
In turn, we have held that a draft of an agency’s official history is pre-deci-sional and deliberative, and thus protected under the deliberative process privilege. See Dudman Communications, 815 F.2d at 1568-69; Russell, 682 F.2d at 1048-49. Those precedents pose a substantial hurdle to the FOIA requester’s claim in this case.
To overcome those precedents and obtain release of Dr. Pfeiffer’s draft of Volume V, the FOIA requester asserts a string of arguments. None is persuasive.
First, the FOIA requester points out that there was no final CIA history that arose out of or corresponded to Volume V. That is true, but we do not see the relevance of the point. There may be no final agency document because a draft died on the vine. But the draft is still a draft and thus still pre-decisional and deliberative. See NLRB v. Sears, Roebuck & Co.; 421 U.S. 132, 151 n. 18, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). A Presidential speechwriter may prepare a draft speech that the President never gives. A Justice Department aide may give the Attorney General a draft regulation that the Attorney General never issues. Those kinds of documents are no less drafts than the drafts that actually evolve into final Executive Branch actions. Moreover, the writer does not know at the time of writing whether the draft will evolve into a final document. But the writer needs to know at the time of writing that the privilege will apply and that the draft will remain confidential, in order for the writer to feel free to provide candid analysis. A privilege contingent on later events—such as whether the draft ultimately evolved into a final agency position-—-would be an uncertain privilege, and as the Supreme Court has said, an uncertain privilege is “little better than no privilege at all.” Upjohn Co. v. United States, 449 U.S. 383, 393, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); see also Swidler & Berlin v. United States, 524 U.S. 399, 408-09, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998). In short, to require release of drafts that never result in final agency action would discourage innovative and candid internal proposals by agency officials and thereby contravene the purposes of the privilege.
Second, the FOIA requester says that the CIA has released similar information regarding the Bay of Pigs operation, *464 including the other volumes. However, an agency does not forfeit the benefit of a FOIA exemption simply because of its pri- or decision to voluntarily release other similar information. See Army Times Publishing Co. v. Department of the Air Force, 998 F.2d 1067, 1071 (D.C.Cir.1993) (Air Force had not “ ‘waived’ its right to claim an exemption from disclosure simply because it has released information similar to that requested”). Indeed, penalizing agencies in that way would discourage them from voluntarily releasing information, which would thwart the broader objective of transparent and open government.
Third, the FOIA requester claims that the CIA has identified no concrete harm that would result from release of the draft of Volume V. But as we have said before, “Congress enacted FOIA Exemption 5 ... precisely because it determined that disclosure of material that is both predecisional and deliberative does harm an agency’s decisionmaking process.” McKinley v. Board of Governors of the Federal Reserve System, 647 F.3d 331, 339 (D.C.Cir.2011). The harm from release is, among other things, the harm to the candor of present and future agency decision-making. Courts may not “second-guess that congressional judgment on a case-by-case basis.” Id.
Fourth, the FOIA requester contends that the passage of time since Dr. Pfeiffer wrote his draft renders the deliberative process privilege inapplicable here. According to the FOIA requester, the CIA’s interest in protecting any contentious or sensitive issues discussed in the draft of Volume V has diminished over time. But unlike some statutes, such as certain provisions of the Presidential Records Act, see 44 U.S.C. § 2204(a), Exemption 5 of FOIA does not contain a time limit.[1] We must adhere to the text of FOIA and cannot judicially invent a new time limit for Exemption 5. See generally Milner v. Department of the Navy, — U.S. -, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011).
Moreover, privileges that are intended to facilitate candid communication, such as the deliberative process privilege, generally do not have an expiration date. That makes sense because such a privilege otherwise would not fully serve its purposes. As we have noted, in order for a privilege to encourage frank and candid debate, the speaker or writer must have some strong assurance at the time of the communication that the communication will remain confidential. Premature release of material protected by the deliberative process privilege would have the effect of chilling current and future agency decisionmaking because agency officials — realizing that the privilege evaporates over time — would no longer have the assurance that their communications would remain protected. And without that assurance, they in turn would not feel as free to advance the frank and candid ideas and advice that help agencies make good decisions. See generally Swidler & Berlin, 524 U.S. at 407-08, 118 S.Ct. 2081; Access Reports, 926 F.2d at 1196. In addition, looking backward, premature release of privileged information would risk embarrassment of individuals who had put forth certain ideas on the understanding and assurance that their communications would remain confidential. To avoid such an unfair bait and switch, *465 among other reasons, the Supreme Court has recognized that a privilege designed to encourage candid communications must be durable and lasting. See Swidler & Berlin, 524 U.S. at 407-08, 118 S.Ct. 2081 (involving attorney-client privilege). In short, we reject the FOIA requester’s argument that the deliberative process privilege applicable to Dr. Pfeiffer’s draft has somehow expired.
Fifth, even if its arguments for the entire draft of Volume V are unavailing, the FOIA requester contends that some portions of the draft may contain factual material that is not protected by the deliberative process privilege and is “reasonably segregable.” 5 U.S.C. § 552(b). The District Court concluded that the entirety of the draft is protected by Exemption 5. The District Court’s decision adheres to our precedents in this context. Our cases have made clear that a draft agency history may not be dissected by the courts in the manner suggested by the FOIA requester here. See Dudman Communications, 815 F.2d at 1568-69; Russell, 682 F.2d at 1048-49. In producing a draft agency history, the writer necessarily must “cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose,” and “identify the significant issues.” Mapother v. Department of Justice, 3 F.3d 1533, 1538 (D.C.Cir.1993). In doing so, “the selection of the facts thought to be relevant” is part of the deliberative process; it necessarily involves “policy-oriented judgment.” Id. at 1539 (internal quotation marks omitted); see also Horowitz v. Peace Corps, 428 F.3d 271, 276-77 (D.C.Cir.2005); Wolfe v. Department of Health & Human Services, 839 F.2d 768, 774 (D.C.Cir.1988) (en banc); Lead Industries Association, Inc. v. OSHA, 610 F.2d 70, 85 (2d Cir.1979).
Applying that reasoning in Russell and Dudman, we held that draft versions of official Air Force histories were exempt from disclosure. See Dudman Communications, 815 F.2d at 1568-69; Russell, 682 F.2d at 1048-49. We must reach the same result here when assessing Dr. Pfeiffer’s draft history. In the narrow confines of this case, which involves a draft agency history, we agree with the District Court that the draft of Volume V is exempt in its entirety under Exemption 5. To be clear, as we emphasized in Dudman, if a person “requests particular factual material — e.g., material relating to an investigation of a war crime — an agency cannot withhold the material merely by stating that it is in a draft document____The exemption plainly applies in this case because [the FOIA requester] asked not for particular factual material, but for the draft in which [the FOIA requester] thought the material could be found.” 815 F.2d at 1569.
* * *
We affirm the judgment of the District Court.

So ordered.

. By its terms, moreover, the Presidential Records Act does not and could not "limit ... any constitutionally-based privilege which may be available to an incumbent or former President.” 44 U.S.C. § 2204(c)(2). So the time limit in that Act, as applied to those privileges, changes the procedure for asserting the privilege, not the scope or duration of the privilege.