# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued January 12, 2021          Decided July 2, 2021

No. 20-5091

REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND
ASSOCIATED PRESS,
APPELLANTS

v.

FEDERAL BUREAU OF INVESTIGATION AND UNITED STATES
DEPARTMENT OF JUSTICE,
APPELLEES

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cv-01392)

―――――

*Katie Townsend* argued the cause and filed the briefs for
appellants.

*Joseph F. Busa*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Jeffrey Bossert Clark*, Acting Assistant Attorney General at the
time the brief was filed, and *H. Thomas Byron, III*, Attorney.

Before: MILLETT, KATSAS, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: In June 2007, FBI agents impersonated members of the press so that they could trick an unknown student who had threatened to bomb his school into revealing his identity. When news of the FBI's tactics became public, media organizations were incensed that their names and reputations had been used to facilitate such a ruse. The Reporters Committee for Freedom of the Press and the Associated Press filed Freedom of Information Act requests with the FBI seeking more information about the nature and usage of the FBI's ploy.

The district court ruled that the government could withhold from disclosure dozens of the requested documents under FOIA Exemption 5. More specifically, the court ruled that the documents are protected by the common law deliberative process privilege, and that their disclosure would likely cause harm to the agency's deliberative processes going forward.

We affirm in part, reverse in part, and dismiss in part. The government properly withheld the emails in which FBI leadership deliberated about appropriate responses to media and legislative pressure to alter the FBI's undercover tactics, as well as internal conversations about the implications of changing their undercover practices going forward. But the government did not satisfy its burden to show either that the other documents at issue in this case were deliberative or that their disclosure would cause foreseeable harm.

3

**I**

**A**

Congress enacted the Freedom of Information Act in 1976 to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny[.]" *Department of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted). The law generally commands that government agencies, "upon any request for records * * * shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3).

In enacting FOIA, Congress provided that agencies may only withhold information that falls within one of the Act's nine enumerated exemptions from disclosure. 5 U.S.C. § 552(b); *see also Rose*, 425 U.S. at 361. Those "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. The burden of proving the applicability of an exemption falls on the agency. *Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting 5 U.S.C. § 552(a)(4)(B)).

This case concerns Exemption 5, which states that agencies need not disclose "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). But the Exemption's protection of documents covered by "the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested[.]" *Id*. As the latter language indicates, Exemption 5 includes the so-called "deliberative process privilege," which shields "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v.*

*Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotation marks and citation omitted); *see also United States Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021); *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862, 866–869 (D.C. Cir. 1980).

In 2016, Congress enacted the FOIA Improvement Act, Pub. L. No. 114-185, 130 Stat. 538 (2016). That legislation implemented several changes to FOIA that were designed to increase the availability of government records to the public. H.R. REP. NO. 391, 114th Cong., 2d Sess. 1, 7–8 (2016); S. REP. NO. 4, 114th Cong., 1st Sess. 2–5 (2015). As relevant here, Congress mandated that agencies may only withhold information under a FOIA exemption if the agency "reasonably foresees that disclosure would harm an interest protected by an exemption" or if "disclosure is prohibited by law[.]" FOIA Improvement Act § 2, 130 Stat. at 539 (codified at 5 U.S.C. § 552(a)(8)(A)(i)). This rule applies only to requests for records under FOIA made after June 30, 2016. *Id.* § 6, 130 Stat. at 544–545.

## B

In June 2007, law enforcement investigated a series of emailed bomb threats targeted at Timberline High School in Lacey, Washington. The sender was anonymous, and when local officials were unable to identify the culprit, they called in the FBI.

According to contemporaneous reporting, the FBI sent the suspect a "secret surveillance program" that was "designed to surreptitiously monitor" his electronic activities by recording his device's IP address, running programs, operating system, logged-in user name, and last visited URL. Kevin Poulsen, *FBI's Secret Spyware Tracks Down Teen Who Made Bomb Threats*, WIRED (July 10, 2007), https://www.wired.com/2007/

5

07/fbi-spyware/ (last accessed June 29, 2021). The program then transmitted all of that information to the government. *Id*. With that information in hand, law enforcement was able to identify the suspect, a 15-year-old student at the school.

It was not until more than seven years later, on October 27, 2014, that the public learned how the FBI had enticed the suspect to load the monitoring program onto his computer. FBI agents planned a simple appeal to ego by "flatter[ing] the culprit into clicking a link to what appeared to be press coverage suggesting that he had outsmarted the authorities[.]" *Reporters Comm. for Freedom of the Press v. FBI* (*Reporters Comm. II*), 877 F.3d 399, 401 (D.C. Cir. 2017). That click would then trigger delivery of the specialized software that revealed his computer's location. *Id.*

To put that plan in motion, an FBI Special Agent contacted an anonymous social-media account that was associated with the threats. The Agent "identified himself as an Associated Press 'Staff Publisher,' and requested input on a draft article" that was made to appear as though it would be published on the *Seattle Times*' website and that was "accessible through an emailed link." *Reporters Comm. II*, 877 F.3d at 401. The ruse worked. The suspect "took the bait, clicking the link and unwittingly downloading the malware." *Id.* "Within hours, the FBI had its man." *Id*.

Seven years went by before an American Civil Liberties Union technologist spotted a reference to the FBI's methodology in some FBI documents released in response to an earlier FOIA request. *Reporters Comm. II*, 877 F.3d at 401. In October 2014, the ACLU technologist shared his discovery over Twitter, and "within days, news of the media impersonation tactics employed at Timberline prompted headlines nationwide." *Id*.

Forceful criticism of the tactic quickly followed. The *Seattle Times*' editor said: "We are outraged that the FBI, with the apparent assistance of the U.S. Attorney's Office, misappropriated the name of The Seattle Times to secretly install spyware on the computer of a crime suspect[,]" and "[t]he FBI's actions, taken without our knowledge, traded on our reputation and put it at peril." J.A. 343. The Associated Press's director of media relations said: "This ploy violated AP's name and undermined AP's credibility." J.A. 344. The *New York Times* editorial board wrote that the Associated Press was "rightly outraged" by what it called the "deceptive tactics used in * * * Seattle," which it said "risk[ed] opening the door to constitutional abuses on a much wider scale" unless the government or the courts acted quickly to end the practice. Editorial, *Deceptions of the F.B.I.*, N.Y. TIMES (Oct. 31, 2014), https://www.nytimes.com/2014/11/01/opinion/deceptions-of-the-fbi.html (last accessed June 29, 2021).

Members of Congress added their own expressions of concern. *See* Letter from Sen. Patrick Leahy, Chairman, Senate Judiciary Comm., to Attorney Gen. Eric Holder (Oct. 30, 2014) at 1, *Reporters Comm. for Freedom of Press v. FBI*, No. 15-cv-1392 (D.D.C. April 25, 2016), ECF No. 19-14 ("Leahy Letter") ("When law enforcement appropriates the identity of legitimate media institutions, it not only raises questions of copyright and trademark infringement but also potentially undermines the integrity and credibility of an independent press."); *see also* Letter from Sen. Chuck Grassley, Chairman, Senate Judiciary Comm., to James Comey, Dir., FBI (June 12, 2015), J.A. 358–359 ("Grassley Letter") (stating that the FBI's tactic "raise[s] important issues").

On November 6, 2014, the *New York Times* published a letter to the editor from then–FBI Director James Comey in

which he defended the Bureau's policy against that widespread criticism.

In September 2016, the Department of Justice's Inspector General released a report entitled "A Review of the FBI's Impersonation of a Journalist in a Criminal Investigation." That report revealed that, in June 2016, the FBI "adopted a new interim policy * * * that provides guidance to FBI employees regarding their impersonation of members of the news media during undercover activity or an undercover operation," and prohibits such conduct unless it is first reviewed and approved by high-ranking FBI officials.  J.A. 365.

## C

On October 31, 2014, the Reporters Committee for the Freedom of the Press submitted two FOIA requests to the FBI. The first request sought "all records concerning the FBI's utilization of links to what are or appear to be news media articles or news media websites to install data extraction software, remote access search and surveillance tools, or the Computer and Internet Protocol Address Verifier[.]"  J.A. 34. The second requested copies of "all records concerning the FBI's guidelines and policies concerning undercover operations or activities in which a person may act as a member of the news media[.]"  J.A. 39, 450.  Days later, the Associated Press submitted a similar FOIA request to the FBI.

The FBI said in response to the Reporters Committee's first request that it had not found any relevant records, and offered no response at all to the other two FOIA requests.  The Reporters Committee and the Associated Press (collectively, "News Organizations") then initiated a lawsuit against the FBI and the Department of Justice.  The complaint alleged, among other things, that the FBI had conducted an inadequate search for responsive records and that it must be wrongly withholding

responsive documents. *Reporters Comm. II*, 877 F.3d at 401; *see also* J.A. 11–12, 451. The FBI eventually located 267 pages of records during the course of the litigation before the district court, releasing 83 pages in full and withholding the remainder in full or in part. The News Organizations maintained that the FBI's search had been inadequate and argued that its withholdings were unjustified.

The district court granted summary judgment for the government, holding that the FBI's search was adequate, that the FBI had justified its withholdings, and that the FBI had reasonably segregated information that may be disclosed. *See generally Reporters Comm. for Freedom of the Press v. FBI* (*Reporters Comm. I*), 236 F. Supp. 3d 268 (D.D.C. 2017).

**D**

The News Organizations appealed. On December 5, 2017, while that appeal was pending, the Reporters Committee submitted another FOIA request to the FBI, seeking six categories of records. The first two categories in that request were identical to its prior request except that the Reporters Committee updated the request to include records from *after* November 1, 2014, which was the FBI's previous cutoff date for its record search. J.A. 452. The four other categories related to the September 2016 report issued by the Justice Department's Office of Inspector General addressing the FBI's impersonation of media members during the Timberline investigation.

When the FBI failed to provide a sufficient response or to produce any documents within the statutory time limit, *see* 5 U.S.C. § 552(a)(6)(A)(i), the Committee filed another lawsuit, which the district court treated as a related case.

Meanwhile, this court issued a decision reversing and remanding the district court's grant of summary judgment for the government. We ruled that the FBI's search for documents was inadequate because it had not searched for records in certain offices that, by the FBI's own past admission, were "reasonably likely" to possess relevant materials. *Reporters Comm. II*, 877 F.3d at 406. Nor had the FBI searched the Director's Office for records despite "unmistakabl[e]" evidence that that Office was "intimately involved" in coordinating the response to the unfolding controversy. *Id*. at 407.

After our decision in *Reporters Committee II,* the FBI began releasing additional records in response to both the 2014 and 2017 requests. The FBI released 328 pages (in full or in part) and withheld the remaining 283 pages in full. Of those 283 pages, the FBI withheld 201 of them as duplicates of already released documents. The government claimed that the remaining 82 pages were exempt from disclosure in full pursuant to FOIA Exemptions 1, 3, 5, 6, 7(C), and 7(E), 5 U.S.C. § 552(b)(1), (3), (5), (6), 7(C) & 7(E).[1]

The parties cross-moved for summary judgment on the validity of those exemptions. The FBI submitted two declarations in support of its withholdings from David Hardy, the FBI's chief FOIA response officer. The Justice Department submitted a declaration from Deborah Waller, the FOIA officer

---

[1] Exemption 1 protects classified information. Exemption 3 protects information for which other federal statutes prohibit release. Exemptions 6 and 7(C) protect information that, respectively, would or could result in an unwarranted invasion of personal privacy. And Exemption 7(E) protects techniques or procedures used in law enforcement investigations or prosecutions.

for the Office of the Inspector General, in support of its claimed exemptions involving the Inspector General report.

As relevant here, the News Organizations argued that the government failed to justify its invocation of the deliberative process privilege as to six categories of withheld documents. Specifically, the News Organizations challenged the withholding of (1) an email chain between FBI personnel and Director Comey in which they discussed revisions to a draft of his *New York Times* letter to the editor defending the media-impersonation policy; (2) drafts of the September 2016 Inspector General Report; (3) the FBI's "Factual Accuracy Comments" on the Inspector General's draft report; (4) drafts of PowerPoint slides allegedly concerning undercover operations; (5) the Inspector General's cover memo accompanying the submission of the final Inspector General Report to Director Comey; and (6) emails between FBI attorneys and other FBI personnel discussing recommendations for policy changes in the approval process for undercover investigations involving impersonation of the news media.

The district court granted summary judgment for both the FBI and the Justice Department, upholding all of the withholdings. The News Organizations timely appealed the district court's determination that the six categories of documents outlined above were exempt from release because they were protected by the deliberative process privilege. They similarly appealed the district court's determination that release of those documents would foreseeably harm the interests protected by the privilege.

## II

The district court had subject-matter jurisdiction to hear this case under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

Our jurisdiction to review the district court's decision rests on 28 U.S.C. § 1291.

We review *de novo* a district court's decision on summary judgment in a FOIA case. *Hall & Assocs. v. EPA*, 956 F.3d 621, 629 (D.C. Cir. 2020). Because the government bears the burden of establishing that a FOIA exemption applies, we may affirm only if we detect no genuine issue of material fact as to an exemption's applicability. *Pavement Coatings Tech. Council v. United States Geological Surv.*, 995 F.3d 1014, 1020 (D.C. Cir. 2021). In ruling on summary judgment, courts may rely on non-conclusory agency affidavits demonstrating the basis for withholding if they are not contradicted by contrary evidence in the record or by evidence of the agency's bad faith. *Shapiro v. Department of Justice*, 893 F.3d 796, 799 (D.C. Cir. 2018).

**III**

To carry its burden at summary judgment, the government must demonstrate that (A) the materials at issue are covered by the deliberative process privilege, and (B) it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege. *Machado Amadis v. Department of State*, 971 F.3d 364, 370 (D.C. Cir. 2020); *see* 5 U.S.C. § 552(a)(8)(A)(i)(I).

**A**

The deliberative process privilege "covers 'documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which [g]overnment decisions and policies are formulated[.]'" *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (citing *Sears*, 421 U.S. at 150). The privilege assures agency staff that they can provide their candid opinions and

recommendations to decisionmakers without fear of ridicule or reprisal. *Coastal States*, 617 F.2d at 866. It also protects policymakers from premature disclosure of their proposals before they have been completed or adopted. *Id.* And it guards against "confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Id.*

All of this is in service of the same goal, which is to "prevent injury to the quality of agency decisions." *Sears*, 421 U.S. at 151; *see also Fish & Wildlife Serv.*, 141 S. Ct. at 785. The privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options," as well as an "understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Judicial Watch, Inc. v. Department of Defense*, 847 F.3d 735, 739 (D.C. Cir. 2017).

The privilege may only be invoked for documents that are both predecisional and deliberative. *Fish & Wildlife Serv.*, 141 S. Ct. at 785–786. A document is predecisional if it was "generated before the agency's final decision on the matter[.]" *Id.* at 786; *see Coastal States*, 617 F.2d at 866 . A document is deliberative when it is "prepared to help the agency formulate its position[,]" *Fish & Wildlife Serv.*, 141 S. Ct. at 786, and it "reflects the give-and-take of the consultative process[,]" *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting *Coastal States*, 617 F.2d at 866).

The News Organizations argue that the district court erred in finding that the deliberative process privilege shields six categories of documents from disclosure. We agree in part. The government properly invoked the deliberative process

privilege over both the Comey emails and the emails between FBI personnel and attorneys discussing possible changes to their media impersonation policy, as well as over drafts of the Inspector General report. But the government failed to justify the privilege's application to withhold the Factual Accuracy Comments in full, without undertaking a segregability analysis. Nor was it entitled to withhold the draft PowerPoint slides. The dispute over the Inspector General's cover letter is moot.

**1**

The first category of documents consists of emails discussing proposed changes to Director Comey's draft letter to the *New York Times*' editor, in which he defended the FBI's media impersonation policy and the sufficiency of existing internal limitations on the FBI's use of media impersonation. We hold that, under the circumstances, those communications fall within the deliberative process privilege.

**a**

To qualify for protection under the deliberative process privilege, documents must be "predecisional," meaning that they generally must have been created "during an agency's deliberations about a policy, as opposed to documents that embody or explain a policy that the agency adopts." *Fish & Wildlife Serv.*, 141 S. Ct. at 783.

Upon a proper showing, the privilege may extend to internal deliberations over how best to promote or preserve an existing policy in the midst of public debate over whether the government should have such a policy. So it is here.

Relevant here, in *Access Reports v. Department of Justice*, 926 F.2d 1192 (D.C. Cir. 1991), the Justice Department had proposed amendments to FOIA and prepared an internal report

to help officials rebut criticisms levied at those amendments as the Department sought to push them through Congress, *id.* at 1193. We held that the internal report fell within the scope of Exemption 5, even though the agency "could not 'pinpoint' a later decision to which the document contributed." *Id.* at 1193, 1196. That is because the materials contributed to "the [agency]'s study of how to shepherd [its] bill through Congress" under significant public criticism, and that itself was a part of the policymaking process. *Id.* at 1196. On that basis, the deliberative process privilege shielded from disclosure those internal deliberations about whether to adopt and how to promote and defend a particular policy desired by the agency. *Id*. at 1196–1197.

Likewise, in *Krikorian v. Department of State*, 984 F.2d 461 (D.C. Cir. 1993), the State Department had published an article that reversed the policy of the United States government concerning the Armenian genocide, *id.* at 463. The State Department later retracted that statement. *Id.* We held that drafts of replies to public inquiries about the published article were shielded from disclosure as "advisory opinions that are important to the deliberative process." *Id.* at 466. Because the article's publication unsettled the policy landscape, those draft documents represented an important component of the agency's ongoing internal work to settle on a substantive policy approach, which is distinct from documents that would simply describe an already-adopted policy. *See Fish & Wildlife Serv.*, 141 S. Ct. at 786 ("What matters, then, is not whether a document is last in line, but whether it communicates a policy on which the agency has settled.").

The discussions regarding proposed revisions to Director Comey's letter to the editor in this case are of a piece with the documents in *Access Reports* and *Krikorian*. The FBI's high-ranking officials were debating how to formulate the most

appropriate and effective response to an ongoing national controversy that threatened to eliminate or destabilize its existing policy practice. The record demonstrates that the FBI was under significant pressure from Congress (including the chairman of the Senate committee responsible for the Bureau's oversight), the media, and the public to change its policies relating to certain types of undercover operations. Leahy Letter, *supra*, at 1–2; J.A. 354–355 (*New York Times* editorial calling for FBI's tactics to be "prohibited by the agency or blocked by courts"); *see also* Grassley Letter, *supra*, at 1–4. As the ground was shifting under the Bureau's feet, its leadership generated these pre-publication deliberations not so much to explain the agency's already-decided policy, but to figure out how to best promote and ensure the continuation of the FBI's policy in the face of intense congressional and public criticisms of the agency's preferred policy approach. The documents equally reflected ongoing work to preserve through unsettled waters and at an unpredictable time an at-risk policy that the agency hoped to retain. *See Fish & Wildlife Serv.*, 141 S. Ct. at 786.

The emails, in other words, were part of an internal dialogue about critical judgment calls aimed at advancing the agency's interests in the midst of a vigorous public debate about an FBI undercover policy with a decidedly uncertain future at the time. And while we do not determine whether materials are predecisional based on what decision (if any) was later made, *see National Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (Kavanaugh, J.), the proof is in the pudding here: The FBI ultimately did change its policies to prohibit agents from impersonating members of the media unless such activity has been expressly approved by high-level Bureau officials.

In that way, the emails at issue here are quite distinct from documents that discuss, describe, or defend an already-determined agency policy. *See Fish & Wildlife Serv.*, 141 S. Ct. at 786 (Documents are not predecisional where they "communicate[] the agency's settled position[.]"). Those types of descriptive discussions do not advance the purposes of the deliberative process privilege—to allow agency employees to have the candid discussions necessary to make the best possible policy decisions in service of the public. The emails at issue here, by contrast, documented ongoing internal debates and deliberations about whether and how best to endorse and to advocate for the survival of a substantive policy priority at a time of uncertainty as to its continuation due to significant external pressure to change course. For that reason, the emails qualify as predecisional.

**b**

The emails were also deliberative. They contain the type of back-and-forth exchange of ideas, constructive feedback, and internal debate over how best to promote and to preserve the undercover policy that sits at the heart of the deliberative process privilege. *See, e.g.*, *National Sec. Archive*, 752 F.3d at 462. The News Organizations, in fact, do not dispute the documents' deliberative character.

Instead, the News Organizations contend that these emails fall outside of the privilege's protection because they were sent from Director Comey to his subordinates rather than *vice versa*.

That is incorrect. There is no such directional precondition to protection under the deliberative process privilege. True, we have said that Exemption 5 is generally "designed to protect subordinates' advice to superiors[.]" *Vaughn v. Rosen*, 523 F.2d 1136, 1146 (D.C. Cir. 1975); *see*

*also Machado Amadis*, 971 F.3d at 370 ("[R]ecommendations from subordinates to superiors" are "the core of the deliberative-process privilege[.]").

But at the end of the day, the key to whether a document is deliberative is whether it is part of the "give-and-take" of the "consultative process." *Machado Amadis*, 971 F.3d at 370 (quoting *Department of Defense*, 847 F.3d at 739); *see also Public Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir. 2010); *Food & Drug Admin.*, 449 F.3d at 151; *Coastal States*, 617 F.2d at 866. And when such an internal agency dialogue is underway, communications by both the giver and the taker can fall within the privilege.

Notably, there is no allegation that Director Comey was providing any sort of direction or explaining the basis for a final decision to his subordinates in these emails. If there were, the deliberative process privilege's application would be more tenuous. *See Coastal States*, 617 F.2d at 868 ("[A] document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made."); *see also Brinton v. Department of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) ("[F]inal opinions" not subject to Exemption 5 "typically flow from a superior with policy-making authority to a subordinate who carries out the policy.").

The News Organizations try a different tack in their reply brief, contending that the government failed to articulate how the contents of each specific withheld email reflect its deliberative nature. That argument is forfeited because it was not raised in the opening brief. *Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019).

**2**

The deliberative process privilege also applies to the pre-publication drafts of the Inspector General's report.

The News Organizations do not contest that the drafts were both predecisional and deliberative. Rightly so. Proposed drafts of a non-final agency decision that are still undergoing review, debate, and editing are the type of deliberative work in progress that falls at the core of the deliberative process privilege. *See Fish & Wildlife Serv.*, 141 S. Ct. at 786. We have similarly held that the deliberative process privilege applies to draft agency histories because they examine past agency actions, analyze them, and make recommendations for policy changes going forward. *See, e.g.*, *National Sec. Archive*, 752 F.3d at 463; *Dudman Commc'ns Corp. v. Department of the Air Force,* 815 F.2d 1565, 1568–1569 (D.C. Cir. 1987); *Russell v. Department of the Air Force*, 682 F.2d 1045, 1048–1049 (D.C. Cir. 1982). Inspector General reports serve a similar function by reviewing past agency actions, analyzing their consequences, and proposing changes in agency policy.

The News Organizations nevertheless argue that any portions of these drafts that were incorporated into the final report are stripped of the deliberative process privilege because they were adopted by the agency as its final agency action.

That makes little sense. Whatever appears in the final report is already available to the News Organizations as final agency action. Peeking behind that to discern what portions of drafts were and were not incorporated would reveal the very deliberative process that the privilege protects. *Russell*, 682 F.2d at 1049 (citation omitted).

Anyhow, the News Organizations misunderstand our case law governing when an agency's adoption of privileged material strips it of deliberative process protection. In this context, Exemption 5's aegis falls away only when an agency "chooses *expressly* to adopt or incorporate by reference" the privileged information in its final decision. *Sears*, 421 U.S. at 161 (emphasis added); *see also Electronic Frontier Found. v. Department of Justice*, 739 F.3d 1, 10–11 (D.C. Cir. 2014); *Access Reports*, 926 F.2d at 1197.

Nothing like that happened here. The final Inspector General report does not mention any of the earlier drafts, much less expressly adopt their reasoning as its own. Its content stands on its own. So the draft reports retain their privilege from disclosure.

**3**

The News Organizations' arguments fare much better as to the FBI's Factual Accuracy Comments. Those documents contain comments from the FBI to the Inspector General on the accuracy of purely factual statements in the draft report.

The factual corrections, of course, were predecisional because they were provided to the Inspector General before the final publication of the Inspector General's report. *See generally Electronic Frontier Found.*, 739 F.3d at 8–9 (advisory opinion from Justice Department's Office of Legal Counsel to FBI in assistance with formulating response to criticism of FBI's intelligence gathering methods was protected by deliberative process privilege); *Formaldehyde Inst. v. Department of Health & Hum. Servs.*, 889 F.2d 1118, 1120 (D.C. Cir. 1989) (compiled comments from non-governmental academic journal reviewers on draft CDC report were predecisional).

But the government has failed to establish that the Factual Accuracy Comments were deliberative, as required by the second prong of the test for protection under the deliberative process privilege.

For starters, "[u]nder the deliberative process privilege, factual information generally must be disclosed[.]" *Petroleum Info. Corp.*, 976 F.2d at 1434. While the fact/opinion distinction is not a wooden rule, it is a "rough guide" for sifting out non-deliberative factual content from deliberative policy judgments. *Access Reports*, 926 F.2d at 1195; *see also EPA v. Mink*, 410 U.S. 73, 87–88 (1973) (Deliberative process privilege does not shield "purely factual material contained in deliberative memoranda and severable from its context[.]"); *see also Office of Mgmt. & Budget*, 598 F.3d at 876 ("[A]gencies must disclose those portions of predecisional and deliberative documents that contain factual information that does not 'inevitably reveal the government's deliberations.'") (quoting *In re Sealed Case,* 121 F.3d 729, 737 (D.C. Cir. 1997)).

Here, the separation between fact and deliberation is quite stark. The document containing the factual corrections is a very simple form that contains blanks on which a commenter is limited to identifying the precise location in the Inspector General Report at which a factual correction is being proposed, the fact that is being corrected, and the proposed correction:

OIG **Review of the FBI's Use of a Fictitious Associated Press News Article in a Criminal Investigation**
FACTUAL ACCURACY COMMENTS
FBI DIVISION:
UNIT:

Page/Paragraph/Line Number:

Current Language (verbatim):

Proposed Alternative Language:

Page/Paragraph/Line Number:

Current Language (verbatim):

Proposed Alternative Language:

J.A. 485. This format cabins each correction or change in an isolated and easily segregable fashion, with no apparent room for opinion or non-factual commentary. In that way, its design confines the communication to purely factual (or otherwise segregable) content, and the government has not shown otherwise.

The government argues that all comments on a draft are as privileged as the contents of the draft itself because disclosing the comments necessarily reveals whether those comments were incorporated. But the FBI did not submit these comments for the purpose of exercising "editorial judgment[,]" such as that the matter concerned "was unimportant or otherwise inappropriate for publication." *See Dudman*, 815 F.2d at 1568 (citing *Russell*, 682 F.2d at 1048–1049). And the FBI was not the agency authoring the report; it was the subject of the report. So the fact-checking exercise in which the FBI was asked to

engage did not call for judgment or the candid exchange of ideas.

Given the focused content and narrow function of the Factual Accuracy Comments and the absence in this record of any apparent editorial or contextual input from the FBI, the government has not shown how disclosure of these factual edits would discourage the candid discussion of policy matters within the agency. *See Access Reports*, 926 F.2d at 1195. Instead, the Factual Accuracy Comments simply allowed the FBI to alert the Inspector General "if any statements in the draft were incorrect, incomplete, or divulged sensitive information." J.A. 445 (Fourth Decl. of David M. Hardy). That by itself does not cross the line into deliberative material.

**4**

Neither do the government's draft PowerPoints fall within the deliberative process privilege. The PowerPoints at issue are preliminary versions of an FBI presentation in February 2015 to the White House—months after the controversy arose—that did nothing more than explain the existing FBI policy concerning the conduct of undercover operations. Oral Arg. Tr. at 30:1–5; *id.* at 31:8–10; *see* J.A. 500–513 (final version of the PowerPoint). A document that serves only to explain an existing agency policy "cannot be considered deliberative." *Office of Mgmt. & Budget*, 598 F.3d at 876.

The government argues that a "draft is still a draft" even where there is "no final agency document because a draft died on the vine." Gov't Br. 29 (quoting *National Sec. Archive*, 752 F.3d at 463). That is true. It is also beside the point. No one disputes that the draft PowerPoints are drafts. But to fall within the deliberative process privilege, the drafts must also be deliberative in content. *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–258 (D.C. Cir. 1982) ("Even if a document is a

'draft of what will become a final document,' the court must also ascertain 'whether the document is deliberative in nature.'") (quoting *Coastal States*, 617 F.2d at 866). For example, in *National Security Archive*, on which the government relies, the draft document at issue pertained to crafting an agency history—an authoring exercise that we have recognized as deliberative and editorial, and so subject to Exemption 5. 752 F.3d at 463; *see also Russell*, 682 F.2d at 1048–1049; *Dudman*, 815 F.2d at 1568–1569. The deliberative process privilege could similarly apply to proposed materials that die on the vine like draft speeches for policymakers that are never given, or draft regulations that never see the light of day. *National Sec. Archive*, 752 F.3d at 463. Those types of documents discuss and debate proposed agency policies, positions, and actions.

That is where the presentations at issue here come up short. The government has failed to identify any deliberative component to the draft PowerPoints. They simply describe already-made and in-place policy choices. *See* Oral Arg. Tr. at 31:8–10 (Q: Presentation was "about existing policy, correct?" Government Counsel: "Correct, your honor."). Exemption 5 offers such documents no harbor.

**5**

The News Organizations appealed the government's withholding of portions of a cover letter from the Inspector General that accompanied transmission of his final report to Director Comey. The government released the full and unredacted version of that letter during the pendency of this appeal. So this issue is moot. *Bayala v. Department of Homeland Sec., Off. of the Gen. Counsel*, 827 F.3d 31, 34 (D.C. Cir. 2016) ("[W]here the government has released * * * a portion of the requested documents, the case is moot * * * with

regard to those documents."); *see also Williams & Connolly v. SEC*, 662 F.3d 1240, 1243–1244 (D.C. Cir. 2011).

The News Organizations maintain that the FBI "continues to withhold portions of similar records," and that they want to challenge the propriety of those withholdings. News Orgs. Reply Br. 17 n.4 (citing J.A. 490–492). The problem is that the News Organizations failed to make any argument about those other documents in their opening brief. So those objections are forfeited. *Al-Tamimi*, 916 F.3d at 6. We could hardly rule against the government on an issue it never had a chance to brief.

**6**

The final group of documents at issue is a group of emails between FBI attorneys and other FBI personnel discussing the implementation of the new interim policy on impersonation of journalists. These emails fall within the deliberative process privilege.

The FBI's declarant explained that these emails were predecisional because they preceded the new interim policy on impersonation of media members, and they were deliberative because they reflected "internal advice and recommendations" regarding those policy changes and their procedural incorporation into ongoing and future operations. J.A. 250–251. Because the emails discussed the content of a new policy and alternative paths for its effective implementation, they fall squarely within the deliberative process privilege. *See Coastal States*, 617 F.2d at 866; *see also Lewis v. Department of the Treasury*, --- F. App'x ---, No. 20-5120, 2021 WL 1432655, at *3 (D.C. Cir. March 23, 2021).

The News Organizations mount only a limited challenge to the withholding of these documents, arguing that the

government has insufficiently explained their deliberative nature and failed to identify the decisionmaking authority vested in their authors. *See Arthur Andersen*, 679 F.2d at 258 ("[T]he agency must present to the court the 'function and significance of the document[s] in the agency's decisionmaking process,' [and] 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s][.]'") (formatting modified) (quoting *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 678–679 (D.C. Cir. 1981).

We disagree. The primary Hardy declaration, in combination with produced portions of the redacted emails, adequately demonstrate that the documents constituted candid advice about whether and how FBI policies should or should not change. *See Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) (agency affidavits and unredacted portions of documents work "in tandem" to illuminate the privileged nature of redacted materials). A significant portion of one of the redacted emails, for instance, was identified by its own author as a "recommendation" relating to the FBI's procedures concerning undercover operations and the news media. J.A. 404–405.

And the decisionmaking authority of the persons at issue is evident from the record. One sample email exchange took place between Director Comey and his chief of staff. The "recommendation" email referenced above was sent by the FBI's Section Chief for undercover operations.

To the extent that the News Organizations suggest that the district court erred in relying on a representative sample or categorical description of the documents at issue, they are mistaken. Such "categorization and repetition provide efficient vehicles" for reviewing an agency's withholding decisions

when they "implicate the same exemption for similar reasons." *Food & Drug Admin.*, 449 F.3d at 147. Courts, in fact, routinely review sample documents to determine whether exemptions have been appropriately claimed. *See, e.g.*, *Vaughn*, 523 F.2d at 1143–1145 (evaluating sample reports to determine whether they are part of a deliberative process); *Hunton & Williams LLP v. EPA*, 346 F. Supp. 3d 61, 74 (D.D.C. 2018).

Here, the government has submitted an appropriately descriptive affidavit and exemplar documents in which the redactions match the justifications provided in that affidavit. That provides a sufficient basis for sustaining the government's invocation of Exemption 5.

**B**

Finding the deliberative process privilege applicable to some of the withheld materials does not end the matter. Under the FOIA Improvement Act of 2016, the government may not withhold even those privileged materials unless it also "reasonably foresees that disclosure would harm an interest protected by" the FOIA exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I).

That showing has been met for the Comey emails and the emails among FBI employees and attorneys concerning potential changes to the undercover impersonation policy. But the government's showing of harm for the other documents on appeal falls short—that is, the draft Inspector General's report, the Factual Accuracy Comments, and the draft PowerPoint slides—and so on this record they may not be withheld.

**1**

Congress adopted the FOIA Improvement Act in part out of "concerns that some agencies [were] overusing FOIA exemptions that allow, but do not require, information to be withheld from disclosure." S. REP. NO. 4, 114th Cong., 1st Sess. 2 (2015); *see also* H.R. REP. NO. 391, 114th Cong., 2d Sess. 9 (2016) ("[T]here is concern that agencies are overusing these exemptions to protect records that should be releasable under the law."). Congress was particularly concerned with increasing agency overuse and abuse of Exemption 5 and the deliberative process privilege. H.R. REP. NO. 391, at 9–10 ("The deliberative process privilege is the most used privilege and the source of the most concern regarding overuse."); *see also* S. REP. NO. 4, at 3.

Congress added the distinct foreseeable harm requirement to foreclose the withholding of material unless the agency can "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld." H.R. REP. NO. 391, at 9.[2] Agencies cannot rely on "mere 'speculative or abstract fears,' or fear of embarrassment" to withhold information. S. REP. NO. 4, at 8. Nor may the government meet its burden with "generalized assertions[.]" *Machado Amadis*, 971 F.3d at 371.

In that way, the foreseeable harm requirement "impose[s] an independent and meaningful burden on agencies." *Center*

---

[2] It is apparent from the statutory text alone that the government's successful invocation of a FOIA exemption cannot justify its withholding of exempt material without a more particularized inquiry into what sort of foreseeable harm would result from the material's release. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I). The detailed legislative history of the provision underscores the type of showing that Congress now requires of federal agencies.

*for Investigative Reporting v. United States Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (citation omitted). While agencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—"that is, group together like records" and explain the harm that would result from release of each group—the basis and likelihood of that harm must be independently demonstrated for each category. *Rosenberg v. Department of Defense* (*Rosenberg I*), 342 F. Supp. 3d 62, 78 (D.D.C. 2018).

In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure "would"—not "could"—adversely impair internal deliberations. *Machado Amadis*, 971 F.3d at 371. A "perfunctory state[ment] that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information between senior leaders within and outside of the [agency]" will not suffice. *Rosenberg I*, 342 F. Supp. 3d at 79 (formatting modified); *see also Center for Investigative Reporting*, 436 F. Supp. 3d at 106 (rejecting "general explanations and boiler plate language" regarding foreseeable harm) (internal quotation marks and citation omitted). Instead, what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward. Naturally, this inquiry is context specific. *See Rosenberg v. Department of Defense* (*Rosenberg II*), 442 F. Supp. 3d 240, 259 (D.D.C. 2020); *Center for Investigative Reporting*, 436 F. Supp. 3d at 107; *Rosenberg I*, 342 F. Supp. 3d at 79.

**2**

Under that test, the government failed to demonstrate foreseeable harm from the release of the draft Inspector General report. Neither did it sufficiently show what harm would result from release of the Factual Accuracy Comments or draft PowerPoint slides, making their withholding doubly erroneous. But the record shows that the FBI's decisionmaking process would likely suffer harm from the release of the two groups of emails.

**a**

The government broadly failed to "specifically focus[]" its foreseeable harm demonstration "on the information at issue in [the documents] under review," *Machado Amadis*, 971 F.3d at 371 (quotation marks omitted). Instead, it submitted a series of boilerplate and generic assertions that release of any deliberative material would necessarily chill internal discussions.

The FBI's primary declaration on foreseeable harm may generously be described as scanty. The FBI's broad assertion of foreseeable harm from release of the records under its control was contained in just two "umbrella paragraphs" that purported to sweepingly address "*all* of the deliberative information in the case." Gov't Br. 38. But the assertion of harm in those umbrella paragraphs is wholly generalized and conclusory, just mouthing the generic rationale for the deliberative process privilege itself. *See* J.A. 248 ("Disclosure of [material containing or prepared in connection with the formulation of opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations] would have an inhibiting effect upon agency decisionmaking and the development of policy because it would chill full and frank discussions between agency personnel and decision makers

regarding a decision. If agency personnel know that their preliminary impressions, opinions, evaluations, or comments would be released to the general public, they would be less candid and more circumspect in expressing their thoughts, which would impede the fulsome discussion of issues necessary to reach a well-reasoned decision.").

The FBI's supplemental declaration, which solely concerns the Factual Accuracy Comments, also falls far short. According to Hardy, disclosure of those comments "would set a precedent where employees would come to fear their unrefined opinions could become subject to public disclosure through the FOIA." J.A. 446. But the declaration never explains how the purely factual material contained in those Factual Accuracy Comments constituted "unrefined opinions," *see supra* Part III.A.3, nor how release of that material provided by the FBI to the Inspector General would chill future inter-agency consultations. After all, the FBI is obligated by law to provide information and assistance to the Inspector General. *See* 5 U.S.C. app. § 6(c)(1).

For its part, the Justice Department submitted the Waller declaration in an effort to justify the withholding of its draft Inspector General reports. But that document suffers from the same flaw. Its cookie-cutter formulations nowhere explain why actual harm would foreseeably result from release of the specific type of material at issue here. *See* J.A. 278 ("Release of this draft report would be harmful as the draft would also reveal the thought and decision-making processes of the [Office of the Inspector General] and may not reflect the agency's final decisions."), 279 (identical assertion). Indeed, that declaration contains a sweeping assertion that "requir[ing] disclosure of the withheld information would prevent the [Office of the Inspector General] from engaging in meaningful documented discussion about policy matters in the future,

which could have a negative effect on agency decision-making, and would potentially confuse the public about the reasons for the [Office of the Inspector General]'s actions in this matter." J.A. 281. This is *precisely* the kind of boilerplate, unparticularized, and hypothesized assertion of harm that we said would be insufficient in *Machado Amadis*, 971 F.3d at 371.

We are, in fact, hard pressed to imagine how these assertions differ in any material way from the routine assertions of deliberative process privilege that pre-dated the FOIA Improvement Act. It seems that very little about the FBI's declarations has changed despite passage of the FOIA Improvement Act and its foreseeability requirement. *Compare* Second Decl. of David M. Hardy, *Concepcion v. FBI*, 606 F. Supp. 2d 14 (D.D.C. May 16, 2008) (No. 07-CV-1766), ECF No. 23-1 ("FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date" and thus "[r]elease of this type of information would have an inhibitive effect upon the development of policy and administrative direction."), *with* J.A. 249 (Third Decl. of David M. Hardy) ("FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully-explored options developed from robust debate.").

Although the government contends that its declarations satisfy *Machado Amadis*'s foreseeable harm standard, its argument is far off base. In *Machado Amadis*, the government addressed redactions to two records, totaling four pages. *See*

Joint Appendix at 263–264, *Machado Amadis*, 971 F.3d 364 (No. 19-5088). Yet there, the government's affidavit contained thoroughgoing and detailed pages of explanation as to the importance and deliberative value of the specific information in those records in the particular decisional context in which they arose, as well as the precise damage to the relevant agency operations that would result from their release. *See id.* at 268–272; *see also* 971 F.3d at 371 (affidavit adequately explained that chilling candid discussion among State Department line attorneys would impair the internal discussions "necessary for efficient and proper adjudication of administrative appeals"). In other words, the government directly articulated "[a] link between the specified harm and the specific information contained in the material withheld." *See* H.R. REP. NO. 391, at 9.

In contrast, in this case, Hardy offered nothing more than a perfunctory, sweeping, and undifferentiated declaration that release of every single record withheld would have an "inhibiting effect" by "chill[ing] full and frank discussions[.]" J.A. 248. Unlike the declaration in *Machado Amadis*, Hardy did not explain the particular sensitivity of the types of information at issue or the role that they play in the relevant agency decisional processes (and, therefore, whether and how their release would harm similar deliberations in the future). The Waller declaration fared no better. *See* J.A. 278–279.

Both declarations ignore that the agency must specifically and thoughtfully determine whether it "reasonably foresees that disclosure" of each particular record "would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I); *see id.* § 552(b), (b)(5); *see also* S. REP. NO. 4, at 8 (an agency must review the content of each "particular record" sought and determine whether it "reasonably foresees that disclosing *that particular document*"

would harm an interest protected by the exemption) (emphasis added); H.R. REP. NO. 391, at 9 (agency must "articulate * * * the link between the specified harm and *specific information* contained in the material withheld") (emphasis added).

**b**

As for the emails concerning Director Comey's letter to the editor of the *New York Times* and the emails among FBI personnel concerning the undercover impersonation policy, the foreseeability of harm has been shown on this record.

With respect to the Comey emails, the record establishes the unique sensitivity of discussions among Director Comey and high-ranking FBI officials about how to respond to an ongoing crisis that threatened existing covert Bureau operational tactics. The very context and purpose of those communications bearing on sensitive undercover operations in the midst of a policy crisis make the foreseeability of harm manifest. *See Rosenberg I*, 342 F. Supp. 3d at 79.

For similar reasons, the very nature of the follow-on discussions among FBI personnel about whether and how to change those undercover tactics and how to effectively implement such changes amid ongoing law enforcement operations conveyed particularized indicia of foreseeable harm. On this record, the agency reasonably concluded that disclosure would likely impair the candid discussion of tactical options and proposals for adjusting operations going forward.

In short, the sensitivity of the context in which these conversations arose as well as their subject matter, and the need for confidentiality in discussions of undercover tactics, together provide the particularized context for a finding of foreseeable harm as to both sets of emails.

**IV**

We affirm the district court's judgment as to the Comey emails and the internal FBI emails discussing revisions to their undercover tactics.  We reverse the district court's decision allowing the FBI to withhold the drafts of the Inspector General's report, the Factual Accuracy Comments, and the draft PowerPoint presentations.  The appeal as to the cover letter accompanying the final Inspector General's report is dismissed as moot.  The case is remanded for further proceedings consistent with this opinion.

*So ordered.*