# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 1, 2021        Decided August 19, 2022

No. 21-5113

CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,
APPELLEE

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-01552)

———

*Sarah E. Harrington*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellant. With her on the briefs were *Mark R. Freeman*, *Daniel Tenny*, and *Daniel Winik*, Attorneys.

*Anne L. Weismann* argued the cause for appellee. With her on the brief were *Adam J. Rappaport* and *Conor M. Shaw*.

*Jack Jordan* was on the brief for *amicus curiae* Jack Jordan in support of appellee.

*Austin R. Evers* and *Sarah Colombo* were on the brief for *amici curiae* Senator Sheldon Whitehouse, et al., in support of appellee.

Before: SRINIVASAN, *Chief Judge*, ROGERS and TATEL[*], *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: Upon completing his investigation of Russian interference in the 2016 presidential election, Special Counsel Robert Mueller delivered a two-volume, 448-page report documenting his findings to Attorney General William Barr. The first volume addressed Mueller's investigation into election interference, and the second volume addressed his ensuing investigation into whether President Trump had obstructed justice in his actions concerning the election-interference inquiry.

Two days after receiving the then-confidential Mueller Report, Attorney General Barr sent a letter to Congress providing his overview of it. With respect to the second volume, Barr's letter explained that the Report did not reach a conclusion on whether President Trump's actions amounted to obstruction of justice; that Barr thus was left to make his own determination in that regard; and that he had concluded that the evidence in the Report was insufficient to show that President Trump had obstructed justice. Barr related that his conclusion to that effect resulted in part from consultations with Department of Justice officials including the Office of Legal Counsel. As part of that consultation process, Barr had received a memorandum from the head of the Office of Legal

---

[*] Judge Tatel assumed senior status after this case was argued and before the date of this opinion.

Counsel and another Department official, urging Barr to conclude that President Trump had not obstructed justice.

This appeal concerns that memorandum. Plaintiff Citizens for Responsibility and Ethics in Washington filed a lawsuit under the Freedom of Information Act seeking disclosure of the memorandum and related records. The Department sought to withhold nearly all of the memorandum based on the deliberative-process privilege, which protects records documenting an agency's internal deliberations en route to a governmental decision. The district court rejected the Department's reliance on the deliberative-process privilege and ordered the Department to disclose the memorandum in full. *CREW v. DOJ*, 538 F. Supp. 3d 124 (D.D.C. 2021).

The court determined that the Department had failed to carry its burden to show the deliberative-process privilege applied. In particular, the court held that the Department had not identified a relevant agency decision as to which the memorandum formed part of the deliberations. The Department's submissions, the court explained, indicated that the memorandum conveyed advice about whether to charge the President with a crime. But the court's in camera review of the memorandum revealed that the Department in fact never considered bringing a charge. Instead, the memorandum concerned a separate decision that had gone entirely unmentioned by the government in its submissions to the court—what, if anything, to say to Congress and the public about the Mueller Report.

We affirm the district court. The Department's submissions in the district court gave no indication that the memorandum related to Attorney General Barr's decision about making a public statement on the Mueller Report. Because the Department did not tie the memorandum to

deliberations about the relevant decision, the Department failed to justify its reliance on the deliberative-process privilege.

I.

A.

The Freedom of Information Act (FOIA) requires federal agencies, "upon any request for records," to "make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). FOIA "ensure[s] public access to a wide range of government reports and information." *Bartko v. DOJ*, 898 F.3d 51, 61 (D.C. Cir. 2018) (citation omitted). Congress afforded that access "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 357 (D.C. Cir. 2021) (*RCFP*) (quotation marks omitted) (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

Congress, however, did not "pursue transparency at all costs." *Hall & Assocs. v. EPA*, 956 F.3d 621, 624 (D.C. Cir. 2020). Rather, it recognized that "legitimate governmental and private interests could be harmed by release of certain types of information." *AquAlliance v. U.S. Bureau of Reclamation*, 856 F.3d 101, 102 (D.C. Cir. 2017) (citation omitted). FOIA thus exempts nine categories of records from "the government's otherwise broad duty of disclosure." *Id.* at 103.

This case involves Exemption 5, which protects "inter-agency or intra-agency memorandums or letters that would not

be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). That exemption incorporates the deliberative-process privilege, which covers records "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (citation omitted).

But FOIA's "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U.S. at 361. The exemptions are "narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982). And the government bears the burden to show that any records it withholds fit within a statutory exemption. *RCFP*, 3 F.4th at 357, 361.

## B.

In May 2017, Rod Rosenstein, in his capacity as Acting Attorney General, appointed Robert Mueller as special counsel to investigate Russian interference in the 2016 presidential election. *See* Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters (May 17, 2017), https://go.usa.gov/x6Tcg. Rosenstein authorized Mueller to examine whether President Trump's campaign had coordinated with Russia to influence the election. *Id.* Mueller's mandate also extended to other issues that might arise in the course of his work. Over time, Mueller began to consider whether President Trump had obstructed justice by trying to impede the investigation.

On Friday, March 22, 2019, after completing his investigation, Mueller sent Attorney General Barr the two-

volume Report containing Mueller's findings. The first volume, not at issue here, concluded that the Russian government interfered in the 2016 presidential election in "sweeping and systematic fashion," but the investigation did not establish that the Trump campaign "conspired or coordinated" with Russia. Mueller Report, Volume I, at 1–2. The second volume addressed Mueller's investigation into whether President Trump had obstructed justice in his actions responding to the election-interference investigation.

In that analysis, Mueller explained that he took as a given that the Constitution prohibits the criminal prosecution of a sitting President. A well-known decision from the Department of Justice's Office of Legal Counsel (OLC) had concluded that the indictment or criminal prosecution of a sitting President "would unduly interfere with the ability of the executive branch to perform its constitutionally assigned duties, and would thus violate the constitutional separation of powers." A Sitting President's Amenability to Indictment & Criminal Prosecution, 24 Op. O.L.C. 222, 260 (2000). Mueller "accepted OLC's legal conclusion." Mueller Report, Volume II, at 1.

In light of the sitting President's immunity from criminal prosecution, Mueller declined to determine whether President Trump's potentially obstructive conduct constituted a crime. Mueller explained that accusing the President of a crime without bringing charges would deprive him of a trial, denying him the "ordinary means for an individual to respond to an accusation" and potentially clear his name. *Id.* at 2. Mueller observed, though, that although the OLC opinion precluded bringing criminal charges against a sitting President, it allowed for a criminal investigation during the President's term. Mueller thus conducted a "thorough factual investigation" to "preserve the evidence," in recognition that the President's immunity from prosecution would expire when he left office

and in service of the "strong public interest in safeguarding the integrity of the criminal justice system." *Id.* at 1–2.

While Mueller declined to accuse President Trump of committing a crime in light of the constitutional bar to prosecution, Mueller explained that if he "had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice," he would have said so. *Id.* But Mueller was "unable to reach that judgment." *Id.* at 2. The President's actions presented "difficult issues that prevent[ed] [Mueller] from conclusively determining that no criminal conduct occurred." *Id.* In sum, although the Mueller Report "does not conclude that the President committed a crime, it also does not exonerate him." *Id.* at 182.

On the same Friday that Mueller delivered his Report to Attorney General Barr, Barr and his advisers began preparing a letter to Congress addressing the special counsel's findings. At that time, the Mueller Report was confidential (and would remain so for roughly three weeks, pending the Department's identification of necessary redactions from the Report). During the weekend following the transmittal of the Report to Barr, several of Barr's advisers—including Rosenstein, Assistant Attorney General Stephen Engel, who headed OLC, and Principal Associate Deputy Attorney General Edward O'Callaghan—worked together to draft the letter to Congress.

At the same time, Barr asked Engel and O'Callaghan for a memorandum answering the question Mueller had left open: whether President Trump's actions as described in the Mueller Report "would support initiating or declining the prosecution of the President for obstruction of justice." *See* Memorandum from Steven A. Engel, Assistant Attorney General, and Edward C. O'Callaghan, Principal Associate Deputy Attorney General 1 (Mar. 24, 2019), J.A. 297 [March 2019 memorandum]. Two

days after Mueller delivered his Report to Barr, Engel and O'Callaghan completed their memorandum to Barr. The memorandum concluded that the evidence set forth in the Mueller Report was insufficient to demonstrate that President Trump had committed obstruction of justice.

The memorandum, it is now known (*see* p. 20, *infra*), contained two sections. Section I recommended that the Department should reach a conclusion on whether President Trump's conduct amounted to a crime. The memorandum noted that Mueller had declined to accuse President Trump of obstructing justice but also had declined to exonerate him. According to the memorandum, the Report's failure to take a definitive position could be read to imply an accusation against President Trump "if the confidential report were released to the public." *Id.* at 2, J.A. 298. The memorandum therefore recommended that Barr "reach a judgment" on whether the evidence constituted obstruction of justice. *Id.* Section II of the memorandum concluded that the evidence described in the Report did not suffice "to support a conclusion beyond a reasonable doubt that the President violated the obstruction-of-justice statutes." *Id.* at 1, J.A. 297. Barr signed the memorandum on the day he received it, indicating that he approved its recommendations.

Also on that Sunday, Barr sent his letter to Congress. *See* Letter from William P. Barr, Attorney General, to House and Senate Committees on the Judiciary (Mar. 24, 2019). The letter said that Mueller's "decision to describe the facts of his obstruction investigation without reaching any legal conclusions leaves it to the Attorney General to determine whether the conduct described in the report constitutes a crime." *Id.* at 3. The letter conveyed that, after reviewing the Mueller Report and "consulting" with Department officials including OLC, Barr had "concluded that the evidence

developed during the Special Counsel's investigation is not sufficient to establish that the President committed an obstruction-of-justice offense." *Id.* Barr stated that his "determination was made without regard to, and is not based on, the constitutional considerations that surround the indictment and criminal prosecution of a sitting president." *Id.*

C.

Citizens for Responsibility and Ethics in Washington, a nonpartisan government watchdog organization, submitted a FOIA request to OLC seeking "all documents pertaining to the views OLC provided Attorney General William Barr on whether the evidence developed by Special Counsel Robert Mueller is sufficient to establish that the President committed an obstruction-of-justice offense." Letter from Anne L. Weismann, Chief FOIA Counsel, CREW, to Melissa Golden, Lead Paralegal and FOIA Specialist, Off. of Legal Couns., Dep't of Just. 1 (Apr. 18, 2019), J.A. 63. After receiving no response, CREW filed this lawsuit against the Department of Justice to compel disclosure of the requested records.

During the litigation, the Department produced fifty-six pages of records (with redactions) and withheld 195 pages in full. By the time the parties filed competing motions for summary judgment, CREW contested the withholding, in whole or in part, of only two documents—the March 2019 memorandum from Engel and O'Callaghan to Barr, and another internal Department memorandum. The district court upheld the Department's withholding of the second memorandum, and CREW did not appeal that resolution. As a result, only the March 2019 memorandum remains in dispute.

Before moving for summary judgment, the Department released to CREW a heavily redacted version of that

memorandum. The Department disclosed parts of three sentences from the memorandum's top-line summary, as well as its one-sentence bottom-line conclusion, while withholding the entire remainder of the eight-and-a-half-page memorandum. *See* Brinkmann Decl., Ex. A, J.A. 86–94. Specifically, in the introduction, the Department redacted references to a constitutional bar on prosecuting a sitting President. For instance, the Department disclosed the portion of one sentence conveying that the memorandum "recommend[ed], under the Principles of Federal Prosecution, that [Barr] decline to commence . . . a prosecution" of President Trump for obstruction of justice. *Id.*, J.A. 86. But in that same sentence, the Department redacted the caveat that the memorandum's recommendation would apply only "were there no constitutional barrier" to prosecution. March 2019 Memorandum at 1, J.A. 297. The Department thus initially did not disclose to CREW and the district court that the memorandum's analysis assumed President Trump could not be charged with a crime while in office.

The Department invoked the deliberative-process privilege under Exemption 5 to justify its withholding of that memorandum nearly in full. (The Department also invoked the attorney-client privilege but no longer defends its reliance on that privilege.) In support of its assertion of the deliberative-process privilege, the Department submitted declarations from Paul Colborn, a Special Counsel in OLC, and Vanessa Brinkmann, a Senior Counsel in the Department's Office of Information Policy. Colborn explained that the March 2019 memorandum had been "submitted to the Attorney General to assist him in determining whether the facts set forth in Volume II of Special Counsel Mueller's report would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution." 1st Colborn Decl. ¶ 17, J.A. 51 (quotation marks omitted).

Brinkmann similarly described the memorandum as having been "provided to aid" Attorney General Barr in deciding "whether the evidence developed by [the Special Counsel's] investigation is sufficient to establish that the President committed an obstruction-of-justice offense." Brinkmann Decl. ¶ 11, J.A. 78.

The Department later submitted a second declaration from Colborn. In his first declaration, Colborn stated that Barr sent his letter to Congress "[f]ollowing receipt of the memorandum." 1st Colborn Decl. ¶ 17, J.A. 51. Colborn's second declaration clarified that, while Barr had "reviewed multiple drafts of that memorandum" before sending his letter to Congress, the memorandum in fact was finalized "about two hours" after Barr sent his letter. 2d Colborn Decl. ¶ 9, J.A. 207–08. But the substance of the memorandum, Colborn stated, "did not change in any material way" between the last draft that Barr saw before sending his letter and the final draft Barr signed after sending his letter. *Id.*, J.A. 208.

Over the Department's objections, the district court ordered it to submit the memorandum for ex parte, in camera review. After reviewing the memorandum, the district court granted summary judgment to CREW as to that document. *CREW v. DOJ*, 538 F. Supp. 3d 124 (D.D.C. 2021). The court explained that, to qualify for protection under the deliberative-process privilege, a document must be both pre-decisional and deliberative, a test that requires the government to connect the withheld records to a specific decision-making process. The district court concluded that the Department had failed to carry its burden for two reasons.

First, the court determined that the Department had failed to accurately identify the relevant decision-making process. Although the Department's briefs and declarations suggested

to the court that the memorandum contained advice about whether to prosecute President Trump for obstruction of justice, the memorandum itself showed that its true purpose was something else: to advise Attorney General Barr on whether to "offer a public opinion" on "the strength of the evidence," a topic that the Department had never indicated "was even a subject of the memorandum." *Id.* at 140. Second, the court concluded that the memorandum was not pre-decisional because Attorney General Barr had reached his final decision on how to respond to the Mueller Report, as expressed in the letter he sent to Congress, before the memorandum had been finalized. *See id.* at 143–45. The district court thus ordered the Department to release the memorandum.

The Department appealed, but only as to Section II of the memorandum. The Department thus allowed full disclosure of the introduction and Section I, which together made up the memorandum's first one-and-a-half pages. But the Department asked the district court to stay its order pending appeal as to Section II of the memorandum, which, in the memorandum's ensuing six-and-a-half pages, examined the evidence contained in the Mueller Report and concluded that it was insufficient to demonstrate that President Trump had committed obstruction of justice. The district court granted the stay motion, explaining that disclosure of the full memorandum would moot the Department's appeal.

II.

Judicial review of agency withholdings under FOIA is "de novo." 5 U.S.C. § 552(a)(4)(B). Likewise, we review de novo the district court's decision on summary judgment. *RCFP*, 3 F.4th at 361.

This case concerns the deliberative-process privilege, which, as noted, shields from disclosure "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 150 (quotation marks and citation omitted). Effective agency decision-making often requires candid debate of a policy option's merits and demerits, but "human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances." *Id.* (alteration and quotation marks omitted) (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)); *see also Jud. Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017). The deliberative-process privilege enables agency personnel to engage in open and frank discussions free from the chilling effect attending the prospect of disclosure. *RCFP*, 3 F.4th at 361. Protecting deliberative documents from release to the public thus safeguards the quality of agency decisions. *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001).

To properly invoke the privilege, an agency must show that the records at issue are both pre-decisional and deliberative. *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785–86 (2021). A record is pre-decisional if it was "prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal quotation marks and citations omitted). And a record is deliberative if it "reflects the give-and-take of the consultative process." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quotation marks omitted) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

14

Assessing whether a record is pre-decisional or deliberative necessarily requires identifying the decision (and the associated decisional process) to which the record pertains. An agency invoking the deliberative-process privilege thus must "establish what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Senate of the Commonwealth of Puerto Rico ex rel. Judiciary Comm. v. DOJ*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (internal quotation marks and citation omitted). The agency, that is, "bears the burden of establishing the character of the decision, the deliberative process involved, and the role played by the documents in the course of that process." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984).

To be sure, the deliberative-process privilege may apply even when the agency never reaches a final decision. That could happen, for instance, if an idea "dies on the vine" or meets a "dead-end." *Sierra Club*, 141 S. Ct. at 786. But to carry its burden in such a situation, the agency still must tie the withheld records to a decision-making process, even if that process did not ultimately result in a decision. *Coastal States*, 617 F.2d at 868.

A.

The Department's submissions during the course of this litigation have at various times suggested three decisional processes to which the March 2019 memorandum might have pertained. The first two, as the Department acknowledges, cannot support its reliance on the deliberative-process privilege. As for the third, although that one might well have justified the Department's invocation of the privilege, the Department never relied on—or even mentioned—that decisional process in the district court until the Department had

already noticed its appeal to this court. And the district court was not required to grant judgment to the Department on a theory the Department never presented before taking an appeal.

1.

The first of the three decisional processes suggested in the Department's submissions to the district court concerned whether to charge President Trump with a crime. Although the Department has since clarified that it was never in fact considering a prosecution, the Department's submissions to the district court appeared to indicate in various ways that the March 2019 memorandum made recommendations about an actual charging decision.

In his initial declaration, for instance, Colborn explained that the memorandum "was submitted to the Attorney General to assist him in determining whether the facts set forth in Volume II of Special Counsel Mueller's report 'would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution.'" 1st Colborn Decl. ¶ 17, J.A. 51. Colborn's reference to "initiating or declining" a prosecution could straightforwardly be read to indicate that the Department was wrestling with whether to file charges against the President. Similarly, Brinkmann described the Attorney General's decision as concerning "whether the evidence developed by [the Special Counsel's] investigation is sufficient to establish that the President committed an obstruction-of-justice offense." Brinkmann Decl. ¶ 11, J.A. 78.

The Department's summary-judgment briefing likewise left the impression that the memorandum concerned whether to bring a charge. The Department, for example, argued that the memorandum related to the Department's "legitimate decision

on whether to initiate or decline prosecution of the President for obstruction of justice." Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. and Reply Mem. in Supp. of Def.'s Mot. for Summ. J. and Renewed Mot. to Dismiss at 14, *CREW v. DOJ*, 538 F. Supp. 3d 124 (D.D.C. 2021) (No. 19-cv-1552), ECF No. 19, J.A. 194 [Dep't Summ. J. Reply]; *see also* pp. 22–23, *infra*. And those statements would have been read against the backdrop of the memorandum itself as it appeared at the time of summary-judgment briefing. That version contained the following partially redacted sentence as one of few disclosed segments, adding to the sense that the memorandum concerned an actual charging decision: "Accordingly, ███████████ ████████████ we would recommend, under the Principles of Federal Prosecution, that you decline to commence such a prosecution." Brinkmann Decl., Ex. A, J.A. 86.

As a general matter, records reflecting prosecutors' views on whether the evidence in a case supports initiating a prosecution will qualify for protection under the deliberative-process privilege. That is because an analysis of the sufficiency of the evidence would typically relate to the ultimate decision of whether to bring charges. Accordingly, several decisions have held that prosecutors' notes and internal communications about whether to file charges are exempt from disclosure under the deliberative-process privilege. *See Gov't Accountability Project v. DOJ*, 852 F. Supp. 2d 14, 26 (D.D.C. 2012); *Kishore v. DOJ*, 575 F. Supp. 2d 243, 259–60 (D.D.C. 2008); *Jackson v. USAO*, 293 F. Supp. 2d 34, 39–41 (D.D.C. 2003). Ordinarily, the government would have little difficulty establishing that a prosecutor's views about the sufficiency of the evidence form part of a privileged decisional process about whether to initiate or decline a prosecution.

This, however, is the rare case that falls outside of that typical understanding. As the Department concedes, it never

in fact considered charging President Trump with obstruction of justice or any other crime. Instead, like Special Counsel Mueller, the Department took as a given that the Constitution would bar the prosecution of a sitting President. In light of the Department's "well-known and longstanding view that a sitting President cannot be indicted or prosecuted," the March 2019 memorandum analyzing the evidence against President Trump could not have pertained to any decision about prosecuting him. Dep't Br. 28. The memorandum, then, was neither pre-decisional nor deliberative as to such a decision-making process.

2.

If the Department's analysis of whether the evidence in the Mueller Report would support an obstruction-of-justice charge did not in fact relate to a decision about whether to initiate or decline a prosecution, then why engage in that analysis? The Department's submissions to the district court perhaps could be interpreted to indicate that the memorandum's analysis of that question, if not related to an actual charging decision, was instead part of an abstract thought experiment. On that conception, the memorandum formed part of an academic exercise to determine whether President Trump's conduct met the statutory definition of obstruction, solely for Attorney General Barr's information, without any connection to any ensuing action by Barr or the Department.

As noted above, Colborn's declaration portrays the relevant decision-making process as concerning whether the evidence presented in the Mueller Report "would support initiating or declining the prosecution of the President for obstruction of justice under the Principles of Federal Prosecution." 1st Colborn Decl. ¶ 17, J.A. 51. His use of the conditional "would" might suggest that the inquiry was purely

hypothetical—i.e., if the Constitution permitted a prosecution of President Trump, would there be enough evidence to obtain a conviction?  In a similar vein, the Department's opening brief in our court at one point says that the memorandum "is privileged because it advised the Attorney General on his decision whether the Special Counsel's evidence was sufficient to show that the President obstructed justice, regardless of *why* the Attorney General was making that determination."  Dep't Br. 29–30.

It is not at all clear that a purely hypothetical, academic discussion among agency personnel could qualify for protection under the deliberative-process privilege.  It is true that, early in a decision-making process, an agency might host a free-flowing brainstorming session at which staff members toss around ideas without necessarily having a specific ultimate decision in mind.  And those sorts of early-stage discussions would ordinarily qualify for protection under the deliberative-process privilege.  Presumably, though, the deliberations in that kind of situation at least would have the *possibility* of leading to some later decision.  If there were no such possibility—as was the case here with respect to the actual bringing of charges—it is difficult to see how the conversation could be pre-decisional and deliberative so as to implicate the privilege.

For instance, imagine if instead of asking for a memorandum assessing whether President Trump had obstructed justice, Attorney General Barr had requested a memorandum on whether President Nixon's conduct during the Watergate scandal would constitute obstruction of justice under current law.  And suppose he asked that question because he had simply been curious about whether Nixon committed any crimes.  Of course, the Attorney General could not be considering the initiation of actual criminal charges against a deceased President.  Debates about whether President Nixon

committed a crime thus seemingly would not qualify as predecisional absent an asserted connection to some ensuing decision other than the bringing of a charge.

But we need not decide in this case whether the deliberative-process privilege could ever cover a record memorializing an agency's abstract thought experiment, divorced from any possible ensuing agency decision. The Department does not seek to justify its invocation of the deliberative-process privilege on any such rationale. And the Department disclaimed at oral argument any intention to withhold the March 2019 memorandum as a pure thought experiment about whether the evidence in the Mueller Report sufficed to show that President Trump obstructed justice. Oral Arg. 2:20–3:45. Instead, that determination would need to support some other decision-making process, which leaves one more possibility, to which we turn next.

3.

Because there was never an actual charging decision to be made in this case, and because the Department does not rely on a mere thought experiment about whether the evidence would support a charge as the relevant decisional process, the question naturally arises: what is the decisional process that the Department believes justifies its withholding of the March 2019 memorandum? The Department's answer, per its briefing in our court, is that the memorandum "was intended to assist the Attorney General in deciding what, if anything, to communicate to Congress and the public about whether the evidence recounted in the Special Counsel's report was sufficient under the Principles of Federal Prosecution to support a prosecution." Dep't Br. 25–26. That is, the deliberations about whether the evidence in the Report amounted to a crime went to deciding whether to say something

to the public on that issue, not deciding whether to initiate a prosecution (which was never on the table).

A review of the now-disclosed Section I of the memorandum reveals how the question of whether the evidence in the Report would support a criminal charge was viewed to relate to the possibility of a public statement on the matter. At the time of the district court's decision against the Department, Section I of the memorandum had not been revealed to the public (or to plaintiff CREW). But because the Department later decided to appeal the district court's decision only as to Section II of the memorandum, the Department acceded to disclosure of Section I when it filed its notice of appeal. As a result, it has now been revealed that the authors recommended in Section I that the Department "should reach a judgment" on "whether the President's actions and intent could be viewed as obstruction of justice," and that they did so because of a concern that "the Report's failure to take a position" on that matter might otherwise "be read to imply such an accusation if the [then] confidential report were released to the public." March 2019 Memorandum at 2, J.A. 298.

Section II of the memorandum goes on to explain why, in the authors' view, the evidence in the Report would not support bringing a charge against the President for obstruction of justice. The contents of that analysis in Section II, the Department argues to us, should be protected from disclosure under the deliberative-process privilege. In the Department's view, the privilege should cover deliberations about whether the evidence in the Report would support a criminal charge "even if the Attorney General engaged in those deliberations" not "for the purpose of considering whether to charge the President," but rather "for the purpose of determining the content of a possible public statement regarding the report." Dep't Br. 26 (citation omitted).

The Department's view on that score might well be correct. We have held that an agency's deliberations about how to communicate its policies are privileged, just like its deliberations about the content of those policies. For instance, we approved the Federal Bureau of Investigation's withholding of "proposed revisions" to a letter to the editor written by the Bureau's director. *RCFP*, 3 F.4th at 363. The revisions were pre-decisional and deliberative because "high-ranking officials were debating how to formulate the most appropriate and effective response to an ongoing national controversy." *Id.* We also permitted the Department to withhold an internal report giving officials advice on how to answer public criticism of a proposal, because the privilege encompasses discussions of how to promote and defend a proposed policy. *Access Reps. v. Dep't of Just.*, 926 F.2d 1192, 1196–97 (D.C. Cir. 1991).

The district court accordingly "recognize[d] that internal deliberations about public relations efforts could be covered by the deliberative process privilege." *CREW*, 538 F. Supp. 3d at 140 n.11. And here, it is now apparent that the March 2019 memorandum recommended reaching a conclusion on the evidentiary viability of an obstruction-of-justice charge as a means of preempting a potential public reaction to the Mueller Report. In that light, if the Department's submissions to the district court had connected the memorandum to a decision about making a public statement, then the district court might well have concluded that the memorandum was privileged. But that is not how the Department elected to justify its invocation of the privilege in the district court.

Before the district court issued its decision, nothing in the Department's submissions had suggested that the memorandum fell within the privilege because it advised Attorney General Barr about making a public statement in

response to the Mueller Report. Any notion that the memorandum concerned whether to say something to the public went entirely unargued—and even unmentioned—in the Department's filings. Instead, as outlined earlier, the Department's submissions framed the memorandum as directed at a decision about whether to charge the President, or perhaps at an abstract inquiry about whether the evidence would support such a charge—not at a decision about making a public statement on that issue. Indeed, the Department resisted in camera review of the portions of the memorandum related to a possible decision about making a public statement. It was not until the Department's motion for a stay pending appeal—after it had filed its notice of appeal—that it first mentioned to the district court that the memorandum dealt with "what, if anything, to say to the public about [the] question" of whether "crimes were committed." Def.'s Mot. for Partial Stay Pending Appeal at 7, *CREW v. DOJ*, 538 F. Supp. 3d 124 (D.D.C. 2021) (No. 19-cv-1552), ECF No. 32, J.A. 283 (quotation marks and citation omitted).

The Department now notes that the preparation of the memorandum occurred side-by-side with the preparation of Attorney General Barr's March 24, 2019, letter to Congress, in which he set forth his conclusion that the evidence in the Mueller Report did not support an obstruction-of-justice charge. That context, the Department argues, makes apparent that the memorandum would have advised Barr on whether to issue a statement to the public through that letter (and, if so, what conclusion to communicate).

The Department's filings in the district court, however, simply did not make—or even suggest—that connection. If anything, they suggested the opposite: the initial Colborn declaration stated that "the Attorney General announced his decision publicly in [the March 2019] letter to the House and

Senate Judiciary Committees," which indicated that his relevant "decision" was communicated in the letter, not that his relevant decision was about whether to send the letter (or what to say in it). 1st Colborn Decl. ¶ 17, J.A. 51. The same paragraph of the declaration, moreover, fortified the impression that the relevant decision was whether to bring a charge against the President, not whether to send a letter to Congress. That paragraph, as noted, stated that the memorandum "was submitted to the Attorney General to assist him in determining whether the facts set forth in Volume II of Special Counsel Mueller's report 'would support initiating or declining the prosecution of the President for obstruction of justice.'" *Id.* The Department's later briefing reinforced that impression all the more, repeatedly criticizing CREW's "irrelevant speculation . . . that the Attorney General was not engaged in a legitimate decision on whether to initiate or decline prosecution of the President for obstructing justice," Dep't Summ. J. Reply at 14, J.A. 194 (quotation marks omitted), *see also id.* at 17, J.A. 197, and relying on the notion that the "deliberative process privilege applies to communications related to . . . a final decision by the DOJ not to pursue prosecution of a case," *id.* at 13, J.A. 193 (quotation marks omitted).

In short, while the decisional process on which the Department now relies involved a determination as to whether the Attorney General should make a public statement, none of the Department's submissions to the district court suggested that the March 2019 memorandum related to such a decision. In its briefing to us, the Department expresses regret that its submissions to the district court could have left the misimpression that an actual charging decision was under consideration, and it assures us that any misimpression it may have caused to that effect was inadvertent and not the result of any bad faith. Still, the Department at no point indicated to the

district court that the memorandum gave advice on the making of a public statement. The Department thus failed to carry its burden to establish the relevant decisional process.

Holding an agency to its burden in that regard serves important purposes. "The significance of agency affidavits in a FOIA case cannot be underestimated." *King v. DOJ*, 830 F.2d 210, 218 (D.C. Cir. 1987). In a standard FOIA case, the government agency knows the full contents of any withheld records, while the requester confronting black redaction boxes is (literally) left in the dark. The requester's lack of knowledge "seriously distorts the traditional adversary nature of our legal system's form of dispute resolution." *Vaughn v. Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973). An agency's declarations supporting its withholdings "must therefore strive to correct, however[] imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation." *King*, 830 F.2d at 218.

This case is illustrative. In its district court briefs, CREW focused its arguments on why the Department could not have been considering obstruction charges against the sitting President. That was understandable, because CREW had no reason to suspect that the memorandum might have related to a distinct decisional process about making a public statement. We cannot sustain the withholding of the memorandum on a rationale that the Department never presented to the district court and that CREW therefore never had an opportunity to challenge.

The Department responds with an argument that would effectively shift the burden from the Department to the court. According to the Department, even if it failed to establish that the March 2019 memorandum related to a decision about making a public statement, the district court should have

reached that conclusion of its own accord based on its in camera review of the memorandum. The Department thus now seeks to prevail based on the district court's in camera review even though the Department had initially objected to that review. We cannot accept the Department's argument.

In a FOIA case, the government bears the burden of showing that requested records are exempt from disclosure. The government is a party in every FOIA case, is well versed in the conduct of FOIA litigation, and is fully capable of protecting its own interests in that arena. A district court can rely on the government to do so and can assume that the government has reasons for its choices and an understanding of their implications. It would put too much on the district court—and would relieve the government of its summary-judgment burden—to expect a judge reviewing records in camera to come up with unasserted legal theories for why a document might be exempt from disclosure. To hold otherwise would "seriously distort[] the traditional adversary nature of our legal system's form of dispute resolution." *Vaughn*, 484 F.2d at 824.

Here, the Department failed to satisfy its burden, and the district court, as the court itself explained, was "under no obligation to assess the applicability of a privilege on a ground the agency declined to assert." *CREW*, 538 F. Supp. 3d at 140 n.11. And because we conclude that the Department failed to adequately identify the relevant decisional process, we need not consider the district court's alternative holding that the memorandum was not pre-decisional because it was finalized after Attorney General Barr's letter to Congress.

26

B.

We last consider the Department's argument that it should have been afforded another chance. The Department contends that, even if the district court was not required to grant judgment in its favor, the court at least should have given the Department an opportunity to make supplemental submissions. We are unpersuaded by the Department's assertion that the district court needed to sua sponte grant it a do-over.

The Department was given a number of opportunities to justify its withholding of the March 2019 memorandum. After initially attaching two declarations to its motion for summary judgment, the Department attached an additional declaration to its reply brief. Those three declarations, coupled with the Department's two briefs, gave ample opportunity to identify Attorney General Barr's messaging to the public as the relevant decisional process. But the Department never did so. Nor did the Department ask for an additional chance to clarify its position after seeing the district court's summary-judgment decision, which pointed out that the Department's submissions up to that point had created a misimpression about the nature of the decisional process. The Department did not move for reconsideration, instead seeking only a stay pending appeal. We cannot fault the district court for not giving the Department another chance when the Department never requested one.

We have declined to grant additional opportunities to justify the withholding of a record in comparable circumstances. In *Maydak v. DOJ*, the Department initially sought to withhold certain records under Exemption 7(A). 218 F.3d 760, 762–63 (D.C. Cir. 2000). When the Department later conceded that exemption was inapplicable, we held that it was not entitled to a remand to invoke various additional exemptions. *Id.* at 765. We explained that allowing the

Department to invoke exemptions seriatim, rather than all at once, "interferes both with the statutory goals of efficient, prompt, and full disclosure of information . . . and with interests of judicial finality and economy." *Id.* at 764 (quotation marks, citations, and alteration omitted). Here, requiring the district court to grant the Department an opportunity to rely on a new decisional process would raise similar concerns. And this case, like *Maydak*, does not involve "extraordinary circumstances" in which, "from pure human error," the government "will have to release information compromising national security or sensitive, personal, private information unless the court allows it to make an untimely . . . claim." *Id.* at 767.

This is also not a case in which an agency presents a viable legal theory for a claimed exemption but provides declarations that come up short in tying the requested records to that exemption. In that kind of situation, it may be prudent for a district court to permit supplemental declarations. *See, e.g.*, *Shapiro v. DOJ*, 153 F. Supp. 3d 253, 291 (D.D.C. 2016); *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 187 (D.D.C. 2011); *Smith v. ATF*, 977 F. Supp. 496, 503 (D.D.C. 1997). But here, the Department seeks to rely on a new legal theory justifying the withholding, not to round out the evidentiary support for a legal theory it had presented. Regardless of whether the district court in its discretion could have sua sponte provided a second chance even in these circumstances, the court committed no error by granting judgment against the Department for failing to carry its burden to identify a relevant decisional process.

Our decision is narrow. We do not call into question any of our precedents permitting agencies to withhold draft documents related to public messaging. Indeed, if the Department had identified the March 2019 memorandum's connection to public messaging, the district court might well

have sustained the Department's reliance on the deliberative-process privilege. And of course nothing in our decision should be read to suggest that deliberative documents related to actual charging decisions fall outside the deliberative-process privilege. We hold only that, in the unique circumstances of this case, in which a charging decision concededly was off the table and the agency failed to invoke an alternative rationale that might well have justified its invocation of the privilege, the district court did not err in granting judgment against the agency.

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*